225 N.J. Super. 49 (1988)
541 A.2d 725
WILLIAM GRAVES AND JOYCE A. GRAVES, HIS WIFE, PLAINTIFFS-APPELLANTS,
v.
CHURCH & DWIGHT COMPANY, INC., A NEW JERSEY CORPORATION, DEFENDANT-RESPONDENT.
Superior Court of New Jersey, Appellate Division.
Argued April 26, 1988.
Decided May 18, 1988.
*50 Before Judges PRESSLER, BILDER and SKILLMAN.
Adrian I. Karp argued the cause for appellants (Adrian I. Karp and Kenneth M. Trombly, attorneys; Messrs. Karp and Trombly, on the brief).
Richard Galex argued the cause for respondent (Garruto, Galex and Cantor, attorneys; Richard Galex, on the brief).
The opinion of the court was delivered by PRESSLER, P.J.A.D.
*51 This is a personal injury products liability case in which the trial judge, following a hearing held pursuant to Lopez v. Swyer, 62 N.J. 267 (1973), concluded that plaintiff William Graves was not entitled to the benefit of the so-called discovery rule of accrual. He consequently granted the motion of defendant Church & Dwight Company, Inc., for summary judgment dismissing the complaint. Plaintiff appeals, and based on the trial judge's extensive factual findings, we reverse.
These are the facts which were either undisputed or found by the trial judge. In August 1979 plaintiff William Graves, a senior associate editor of National Geographic Magazine, was vacationing at his home in Martha's Vineyard with his wife Joyce Graves, who sues per quod. On August 22nd, several days after their arrival on the island and following an unexceptional day, Graves awoke sometime after midnight suffering from mild indigestion. He could not find the patent medicines he customarily used on such occasions, either Alka-Seltzer or Bisodol, and recalled that his mother had given him bicarbonate of soda when he was a child. There was a box of Arm and Hammer sodium bicarbonate in the kitchen. He put a small amount of the powder into a glass, filled the glass with water, and drank several swallows of the mixture. Before he could put the glass down, he was overcome by terrible pain and fell to the floor. He called to his wife for assistance. She summoned an ambulance, and he was taken to the Martha's Vineyard Hospital. The diagnosis made by the internist on duty, Dr. Thomas Taylor, was perforated viscus, i.e., a tear somewhere in the upper gastrointestinal tract. Dr. Taylor arranged for the hospital's general surgeon Dr. Charles Claydon to attend to Graves forthwith. Dr. Claydon confirmed the diagnosis, concluding that Graves had suffered a perforated stomach ulcer and deciding that immediate surgical repair was necessary to save his life. In performing the surgery he found a rent approximately six centimeters long from the gastroesophageal junction down the lesser curvature of the stomach, along with *52 massive contamination of the peritoneal cavity. Dr. Claydon was able to make the repair, and although Graves' post-operative course was complicated, he did recover and eventually returned home to Washington, D.C.
Dr. Claydon continued to believe that Graves' problem was a perforated ulcer although there were anatomical anomalies, namely, neither the size nor location of the rent was typical of a perforated ulcer, which is usually less than one centimeter in length and usually located at the bottom of the stomach in the area of the pyloric valve rather than at the top of the stomach. Moreover, he was unable actually to observe an ulcer. Nevertheless, he could not otherwise explain what had happened to Graves, assumed the correctness of the diagnosis, and placed him on an ulcer patient regimen. Thus, Graves, although never having previously suffered from an ulcer, stopped smoking, reduced his alcohol intake, followed a bland diet, and for six months took Tagamet, an antacid remedy. Between August 1979 and October 1983 Graves had a number of additional hospitalizations in Washington and Massachusetts for ventral hernia repair and subphrenic abscess, all related to the original surgery.
Starting with the original hospitalization, the records of all the hospitalizations noted the fact, supplied by plaintiff himself, that the onset of the disabling pain immediately followed ingestion of sodium bicarbonate. None of Graves' physicians, however, ever made a causal connection, although all of them knew that fact. Indeed, some of them, including Dr. Taylor, continued to believe as late as the date of this Lopez hearing that there was no causal connection. Plaintiff and his wife both denied having made a causal connection prior to October 1983, plaintiff testifying that he viewed the significance of the ingestion simply as being part of the chronology and believed that the relevance of the sodium bicarbonate was merely its inability to relieve what was happening to him internally.
*53 In October 1983 Graves received a telephone call from his senior editor who told him to turn on his television set immediately since a man was being interviewed who had had the same problem Graves did. Although Graves missed the segment, he viewed it several days later at the television station. The program was about a man named Michael Webber who several years earlier, while a Virginia resident, had suffered a spontaneous stomach rupture immediately after taking sodium bicarbonate. The facts surrounding Webber's use of the sodium bicarbonate, its aftermath, and the medical and anatomical consequences were almost identical to Graves' own experience. It was also reported on the program that Webber had brought suit against defendant Church & Dwight, the New Jersey manufacturer of Arm and Hammer, which had been settled under undisclosed terms the previous summer. And finally, the program included a statement by one of Webber's expert witnesses, Dr. Edward Moore of the Medical College of Virginia, who believed the rupture had been caused by the sodium bicarbonate. He explained that the combination of sodium bicarbonate with the acid produced by the stomach forms carbon dioxide gas. It was his opinion that when the stomach is already distended by overeating, the "rapid release of gas in the stomach and an enormous rise in pressure" can cause the stomach to rupture. The program concluded by noting that since 1926 six or seven cases of spontaneous stomach rupture attributable to ingestion of sodium bicarbonate had been reported in the medical literature.
It is Graves' contention that it was his viewing of this program which led him to make a causal connection between sodium bicarbonate and his own medical catastrophe. After seeing the program he called Dr. Claydon, who then discussed the matter with Dr. Moore, who sent him a copy of his published paper on the Webber case. Dr. Claydon, for the first time since performing the original operation on Graves, came to believe that a causal connection between the rupture and sodium bicarbonate was probable. He so advised Graves, who then *54 communicated with Webber's attorney. This suit was then commenced on August 8, 1984, just two weeks short of the fifth anniversary of the occurrence and ten months after Graves had seen the television program.
Defendant moved for summary judgment relying on the statute of limitations. It urged that plaintiff knew from the outset or was then chargeable with the knowledge that there was a likelihood of a causal relationship between sodium bicarbonate and his ruptured stomach. Consequently, the cause of action accrued, so it argued, at the time plaintiff suffered the rupture and in any case well before the two-year period immediately preceding the filing of the complaint. Following this Lopez hearing, the trial judge concurred, basing his conclusion on his factual finding that plaintiff and his wife "suspected" from the time of the occurrence that the product had caused his problem and noting further that "even the most average of persons would suspect a cause and effect between the taking of the product and the pain and subsequent surgery." Thus, the trial judge concluded, plaintiff "was at that point in the same position as other tort victims. It was up to him to determine by reasonable diligence whether the ruptured stomach following the taking of baking soda was actionable." We do not quarrel with the trial judge's finding that plaintiff suspected the sodium bicarbonate. While that finding was not mandated by the evidence, it was certainly permissible therefrom. We do, however, in the circumstances here, disagree with the judge as to its legal significance.
It is now well established that the discovery rule is an equitable principle pursuant to which the accrual of a cause of action is not measured by the date the injury occurs but is rather deferred until the time when the injured person first knows or is chargeable with the knowledge both that he has sustained an injury and that it was inflicted by the fault of another. The critical inquiry then in applying the discovery rule is the determination of when the plaintiff knew that he was the victim of an actionable wrong or had sufficient information *55 so that by exercise of due diligence he would have known. Our point of disagreement with the trial judge is his assumption that in the circumstances here plaintiff's suspicions respecting the causative effect of sodium bicarbonate were tantamount to knowledge or at least imposed upon him an obligation of making diligent inquiry to confirm his suspicions. We have no doubt that there are cases in which a particular sequence of events will be attended by that consequence, and hence that the events themselves, because of their nature, commonly understood import and chronological relationship, will or should arouse suspicions which the injured person may ignore, at least in the litigation context, at his peril. In our view, Burd v. New Jersey Tel. Co., 76 N.J. 284 (1978), is such a case. But as the Supreme court has made clear in Vispisiano v. Ashland Chemical Co., 107 N.J. 416 (1987),[1] there are some types of cases in which the injured person's suspicions are not fairly equatable either with actual or constructive knowledge.
Vispisiano is a toxic tort case, and it was expressly within that context that the Court considered the effect on the application of the discovery rule of a plaintiff's suspicions respecting the cause of his injury. The holding of Vispisiano is that in toxic tort cases a plaintiff is not chargeable with "the requisite state of knowledge that would trigger the running of the statute of limitations," until his "impression of the nature of the injury and of its cause" has "some reasonable medical support." Id. at 437. The conceptual basis on which this holding rests is the "inherent difficulty in diagnosing an injury caused by toxic chemicals as well as in discovering the cause of such an injury." Id. at 436. This proposition is evidently not universally true since there are some injuries caused by toxic chemicals where both the cause and effect are immediately *56 apparent, for example, a patron of a commercial swimming pool who is overcome by an accidental release of chlorine gas. Thus, the class of toxic torts encompassed by the Vispisiano holding is really only that involving physical symptoms and diseases whose causal relationship to exposure to toxic substances is not a matter of common understanding by layman and ordinarily not a matter of routine recognition by physicians either.
We see no reason to limit the Vispisiano holding only to toxic torts which meet this standard. Vispisiano itself, in its reference to Mancuso v. Mancuso, 209 N.J. Super. 51 (App.Div. 1986), suggests that the critical element of its rationale is not that the arcane cause of the injury must be a toxic chemical but only that the cause must be arcane  that is, one whose capacity to effect a known injury is not understood by the public at large and, as we said in Mancuso, supra at 54, is ordinarily a matter of "highly specialized medical knowledge." The point, of course, is that a layman should not be charged with knowledge of cause and effect, even cause and effect which he may suspect, when the physicians who are treating him and who have the same factual information on which his own suspicions are based completely discount the validity of those suspicions. In short, a layman cannot fairly be held to a higher standard of medical knowledge than that of the medical community itself.
Our careful review of this voluminous record persuades us that these principles apply here beyond factual dispute. To begin with, there is no question that all the physicians who attended plaintiff and particularly the original surgeon, Dr. Claydon, regarded the use of sodium bicarbonate as an antacid in the same way as the general public does, namely, as an entirely benign agent. Indeed, that was the boast of the deposed officers and employees of defendant  that for 140 years sodium bicarbonate has been a safe and effective *57 antacid remedy widely used by the public at large without need for prescription, warning, or special caveat.[2] Thus, while the phenomenon of extreme abdominal pain immediately following ingestion of sodium bicarbonate might well cause an intelligent person to wonder if there was a causal as well as a chronological relation, the suspicion so engendered cannot be said to rise to the level of actual or constructive knowledge if his own physicians fail to recognize a causal connection. The record also establishes, beyond factual question, that while there were several sporadic reports in medical journals over the last fifty years of the capacity of sodium bicarbonate to cause a spontaneous stomach rupture, that information was not, at least during the entire time period here in issue, generally known within the medical community or even generally accepted by gastroenterologists. According to this record, there is still a measure of skepticism within the medical community respecting the explosive quality of sodium bicarbonate when combined with stomach acid. We further conclude that any obligation plaintiff may have had to make diligent inquiry was met by his having included the fact of his ingestion of sodium bicarbonate as part of the history of his attack, both initially and whenever he required treatment for its sequelae. It was for the physicians to make the connection. They did not do so. He cannot be charged with knowing they were wrong. See Lynch v. Rubacky, 85 N.J. 65, 77 (1981).
We, therefore, reject as unsupported by its own factual findings the ultimate conclusion of the trial court that plaintiff knew or should have known prior to August 1982 that he had sustained an actionable injury caused by defendant's product.
Reversed and remanded for further proceedings.
NOTES
[1] Vispisiano was decided after entry of the summary judgment here, and consequently, the trial judge did not have the benefit of its analysis.
[2] It was only after the Webber case, sometime in 1984, that defendant first included a warning on its packaging to advise that in order to avoid injury to the stomach the product not be taken when the stomach is "overly full."