MARIE ABBOUD, PLAINTIFF–APPELLANT, v. DOMINICK VISCOMI, D.D.S., DEFENDANT–RESPONDENT.

Argued March 28, 1988—Decided June 29, 1988.

*Lisa Murtha* argued the cause for appellant (*Porzio, Bromberg & Newman,* attorneys; *Anita Hotchkiss,* of counsel; *Mark W. Lynch,* on the briefs).

*David Lustbader* argued the cause for respondent (*Philip M. Lustbader* and *David Lustbader,* attorneys).

The opinion of the Court was delivered by

STEIN, J.

The sole question before us is whether plaintiff's dental malpractice complaint was correctly dismissed by the trial court as barred by the two-year statute of limitations. After a hearing conducted pursuant to our decision in *Lopez v. Swyer*, 62 *N.J.* 267 (1973), the court found that plaintiff was aware that defendant had "done something wrong" in extracting her wisdom tooth more than two years prior to her commencing this action, and therefore dismissed her complaint. The Appellate Division affirmed, concluding that the record supported the court's findings of fact and decision. We conclude, however, that the trial court failed to consider certain equitable factors, absent from our previous "discovery rule" cases but implicated in this case. Accordingly, we reverse and remand for a new *Lopez* hearing.

## I

The claims result from the extraction of plaintiff Marie Abboud's lower left wisdom tooth on July 1, 1980. Although the relevant statute of limitations is two years, *N.J.S.A.* 2A:14–2, plaintiff did not file suit until June 13, 1984, nearly four years after the alleged tort was committed. The dispositive issue is the date plaintiff's claim accrued, and specifically whether it accrued before or after June 13, 1982.

Defendant, Dr. Dominick Viscomi, first examined plaintiff on June 3, 1980, when she consulted him for a routine dental examination.[1] At the close of his examination, defendant recommended the extraction of plaintiff's wisdom tooth, and plaintiff agreed. The extraction was performed at defendant's office on July 1, 1980.

---

[1] The facts are culled from plaintiff's and defendant's *Lopez* hearing testimony; they are discussed solely to illuminate the procedural inquiry before us and are not intended to intimate any view on the merits of plaintiff's case.

Plaintiff suspected almost immediately that something had gone wrong during the procedure, apparently because the extraction seemed more difficult to her than those she had experienced in the past; her testimony indicated that she questioned whether defendant had performed the correct procedure to effect the extraction. Afterwards, she experienced substantial pain, and failed to recover normal feeling on the left side of her tongue, cheek, and gums. In addition to a continuing loss of sensation, over the next few months plaintiff began to experience intermittently various symptoms, such as an inability to distinguish various tastes (*e.g.*, sweet, sour) from one another and an inability to detect the location of her tongue while chewing, causing her on occasion accidentally to chew her tongue. Further, plaintiff developed "hypo-hyperthermia," a condition in which the affected portion of her mouth would feel exaggerated thermal sensations from food and drink; on one side of her mouth hot food and drink felt a great deal hotter than it actually was, and cold food and drink felt colder.

Defendant conducted several post-operative examinations during the week following the extraction, and subsequently saw plaintiff on three more occasions, in October and December 1980, and on January 5, 1981.[2] Abboud discussed her symptoms with defendant during these visits, and defendant told her the extraction had caused nerve and muscle damage. According to plaintiff, defendant also explained that her discomfort was a normal part of the healing process and that her condition was not permanent. As she described it, defendant told her, "nerve regeneration takes a very long time * * * [I]t's different in different people, and there [is] no real predictable time * * *. This [regeneration] can take a year or more." Significantly, plaintiff contends she was told that the intermittent nature of her symptoms was indicative of continuing regeneration and healing, and therefore a good sign.

---

[2] The January 5, 1981, visit was unrelated to the extraction.

Defendant agreed that the process of nerve regeneration had been discussed, and stated that he gave plaintiff a time frame of several months to a year from the extraction for healing to occur. In his words, he "was trying to get her to understand there that nature takes a long time to heal in some cases." Dr. Viscomi neither confirmed nor denied plaintiff's characterization of his statements regarding the symptoms' intermittent nature, but did say that as of plaintiff's last visit, six months after the extraction, he felt optimistic she would fully recover. At no time did defendant tell plaintiff her injury was or could be permanent, nor did he advise her to consult another doctor if her injuries failed to heal within a certain time.[3]

After her last visit to Dr. Viscomi in January 1981, plaintiff continued to experience the same symptoms, still believing she was undergoing a normal healing process and that her injury was temporary. Her optimism was fortified when, at some point shortly after her last visit, plaintiff consulted her family doctor and was told to accept Dr. Viscomi's prognosis and stop worrying. Plaintiff later began to doubt defendant's claims that she would heal within a year, but at the same time continued to accept his representations that she would eventually recover. "The term 'a year or more' * * * became fuzzy," plaintiff testified, but because of the continuing intermittent nature of the symptoms, she "always kept in [her] mind that things were getting better."

In December 1983, nearly three years after her last visit to Dr. Viscomi, plaintiff arranged an appointment with a neurologist after learning about a service offering free examinations for New Jersey residents. According to plaintiff, by this point

---

[3]Plaintiff failed to keep an appointment scheduled for mid–1981, roughly one year after the surgery. In response to the suggestion that she consciously disregarded the appointment because she had already lost confidence in Dr. Viscomi, plaintiff testified that although she was not one hundred percent certain, she believed she had simply missed the appointment due to her general inability to keep appointments "because of [her] family situation."

she "was really upset" and "was ready for another opinion." The neurologist she consulted, Dr. Lawrence Taft, examined plaintiff and concluded her nerve damage was permanent. Dr. Taft's opinion was that plaintiff "has suffered a traumatic neuropathy of the lingual nerve and chordatympanal branch of the VII nerve." Plaintiff testified that "the word 'permanent' really hit me, because up until that day I didn't think of it that way." She then consulted an attorney and, roughly six months after Dr. Taft's examination, commenced the present action on June 13, 1984. The complaint contained two counts, one alleging negligence and a second alleging that defendant had failed to obtain Abboud's informed consent prior to the extraction.

After two years of discovery, when the case was set for trial, defendant moved to dismiss the complaint as barred by the statute of limitations. As noted above, the complaint had been filed nearly four years after the actual extraction. Accordingly, pursuant to the mandate of *Lopez v. Swyer, supra,* the court conducted a preliminary hearing to determine if Abboud was entitled to invoke the discovery rule, a doctrine providing "that in an appropriate case, a cause of action will be held not to accrue until the injured party discovers, or by an exercise of reasonable diligence and intelligence should have discovered that he may have a basis for an actionable claim." 62 *N.J.* at 272.

The trial court treated as dispositive plaintiff's admissions that she felt something had gone wrong and promptly had questioned defendant's handling of the extraction, concluding that such knowledge constituted discovery of her cause of action against defendant. The court thus ruled that plaintiff's claim accrued, at the latest, as of her last visit to defendant's office on January 5, 1981, placing her complaint eighteen months beyond the two-year period expiring on January 5, 1983. Plaintiff had argued that the two-year period should not have begun until plaintiff saw Dr. Taft, because up to that point she had reasonably relied on defendant's assertions that she was healing and would recover. However, while the court agreed

"there's no question * * * [plaintiff] did not discover [she had suffered a permanent injury] until the examination of Dr. Taft," it held that knowledge of an injury's permanence is not necessary for discovery of an actionable claim and the start of the limitations period. Consequently, the court made no findings regarding plaintiff's claim.

The Appellate Division, in an unreported decision, affirmed the ruling of the trial court. It concluded that the court's finding concerning plaintiff's awareness of her injury prior to her last visit to defendant was "supported by adequate, substantial and credible evidence in the record." The Appellate Division acknowledged plaintiff's assertion that she had relied on defendant's representations in not filing suit earlier. However, it reasoned that even if the court "credited" plaintiff with a year of reliance from the date of her last visit, and tolled the running of the statute based on defendant's statements concerning the duration of recovery, her claim would have accrued on January 5, 1982, and been barred on January 5, 1984, over five months prior to the date the action was commenced.

We granted plaintiff's petition for certification, 109 *N.J.* 494 (1987), in order to decide whether the discovery rule had been properly applied to the facts of this case.

## II

The history and principles underlying the discovery rule have been examined by us on numerous occasions, *e.g.*, *Vispisiano v. Ashland Chem. Co.*, 107 *N.J.* 416, 425–27 (1987), and need no further elaboration here. Suffice it to say that the rule's "essential purpose * * * is to avoid harsh results that otherwise would flow from mechanical application of a statute of limitations." *Id.* at 426. Accordingly, the doctrine "postpon[es] the accrual of a cause of action" so long as a party reasonably is unaware either that he has been injured, or that the injury is due to the fault or neglect of an identifiable individual or entity. *Id.* at 426–27; *accord Lynch v. Rubacky,*

85 *N.J.* 65, 70 (1981); *Lopez v. Swyer, supra,* 62 *N.J.* at 274. Once a person knows or has reason to know of this information, his or her claim has accrued since, at that point, he or she is actually or constructively aware "of that state of facts which may equate in law with a cause of action." *Burd v. New Jersey Tel. Co.,* 76 *N.J.* 284, 291 (1978).

As discussed above, the trial court found that plaintiff had questioned defendant's competence while still under his care, and despite acknowledging and crediting her belief that she had not been permanently hurt, ruled that her claim had accrued at that point because a suit could have been brought merely for her temporary injuries. Put another way, the court reasoned that "[b]ecause our law is that you can be compensated for temporary as well as permanent injuries," plaintiff had knowledge of sufficient facts to commence an actionable claim. We accept for purposes of this decision both the court's finding that while still under his care plaintiff suspected defendant had done something wrong, and its implicit judgment that such suspicion satisfied the requirement that in order for a claim to accrue, the plaintiff actually or constructively knew her injury was due to another's fault or neglect. *See Burd v. New Jersey Tel. Co., supra,* 76 *N.J.* at 291–93; *Silverman v. Lathrop,* 168 *N.J. Super.* 333, 340 (App.Div.1979); *cf. Lynch v. Rubacky, supra,* 85 *N.J.* at 74–75 (fault requirement not satisfied by plaintiff's mere dissatisfaction with her treatment or sense that something was wrong with her ankle).

We disagree, however, with the conclusion that these findings precluded consideration of the relationship, if any, between defendant's representations and plaintiff's delay in commencing this action. "The discovery rule is essentially a rule of equity," *Lopez v. Swyer, supra,* 62 *N.J.* at 273, and therefore, "each case calls for an identification, evaluation, and weighing of the equitable claims of the parties." *Vispisiano v. Ashland Chem. Co., supra,* 107 *N.J.* at 428. To be sure, "[i]t is not every belated discovery that will justify an application of the rule lifting the bar of the limitations statute. The interplay of the

conflicting interests of the competing parties must be considered." *Lopez v. Swyer, supra,* 62 *N.J.* at 275; *see also id.* at 275–76 ("All relevant facts and circumstances should be considered."). Hence the decision on when a claim accrued clearly requires "more than [ ] simple factual determination[s]." *Id.* at 275.

Here, because the trial court considered plaintiff's knowledge at the time of her last visit to defendant's office to be wholly dispositive of the discovery question, it did not evaluate or weigh her claim that defendant's various representations reasonably induced her not to sue within the normal limitations period. We believe the court should have addressed the facts and events supporting plaintiff's claim, and thus, as in *Lynch v. Rubacky,* "[t]he shortcoming of the determination below rests not so much upon the facts as determined by the trial court as upon the legal significance of those facts under the discovery rule." 85 *N.J.* at 70; *accord Vispisiano v. Ashland Chem. Co., supra,* 107 *N.J.* at 432.

█ In *Vispisiano* we noted the importance in discovery rule cases of examining "the nature of the injury and the difficulty inherent in discovering certain types of injuries." 107 *N.J.* at 428. In the ordinary case, knowledge of any cognizable injury is sufficient to initiate the running of the limitations period, including injuries that are actually, or apparently, insubstantial or transient, assuming the other discovery requirements were met as well. *See Seibert v. Cathey,* 216 *N.J. Super.* 197, 201 (App.Div.1987) (subsequent worsening of injuries did not delay accrual); *Silverman v. Lathrop, supra,* 168 *N.J. Super.* at 339–40 (plaintiff who knew of malignant melanoma with regional metastasis could not claim discovery occurred when he later learned of terminal metastasis to the liver). As explained by the Appellate Division in *Mancuso v. Mancuso,* 209 *N.J. Super.* 51, 59 (1986), relief from a limitations bar will not normally "be available to a plaintiff who merely misjudges the severity of an known injury or who suffers consequent symptoms or ailments

reasonably related to the originally known causally-connected injury."

■ In this case, however, the record contains evidence that plaintiff's failure to sue within the original limitations period was due to defendant's erroneous statements, rather than any unilateral misjudgment concerning the nature of her injury. Although the trial court found plaintiff *could* have sued defendant in January 1981 based on what she knew, she apparently did not consider a transient injury important enough to seek damages, despite the various uncomfortable symptoms she was experiencing. The evidence strongly implies that plaintiff's assumption that she would eventually recover was inspired solely by defendant's various explanations and representations. Furthermore, as noted, the trial court found as fact that plaintiff continued to believe her injury was transient until her examination by Dr. Taft.

Thus, had the court directed its attention to the significance of events postdating January 1981, the record could have supported the conclusion that defendant, in effect, induced plaintiff not to file a timely complaint through erroneous medical counseling. Such a causal relationship between the conduct of a defendant and a plaintiff's delay in filing suit, if established before the trial court, would constitute an equitable factor to be evaluated and weighed along with other relevant considerations. *Cf. Lynch v. Rubacky, supra,* 85 *N.J.* at 75 (where doctor continually advised plaintiff she was healing and plaintiff relied on his advice, it would be "inequitable to find that plaintiff should have suspected malpractice"). That circumstance would distinguish this case from one in which the delay in filing suit is solely attributable to a plaintiff's mistaken assumption that his injury was not serious enough to justify litigation.

An important issue to be decided on remand, taking into account the nature of the doctor-patient relationship, plaintiff's conceded belief that defendant may have handled the extraction

improperly, and the substance and effect of her family doctor's advice, is whether plaintiff's continued acceptance of defendant's assertions concerning recovery, and concomitant delay in seeking a specialist's opinion, was reasonable under the circumstances. *See Vispisiano v. Ashland Chem. Co., supra,* 107 *N.J.* at 433–38 (not unreasonable for plaintiff to interpret doctor's equivocal diagnosis as a rejection of suggestion that chemical exposure had caused illness); *Lynch v. Rubacky, supra,* 85 *N.J.* at 74–75 (despite dissatisfaction with treatment and belief something was wrong, it was reasonable for plaintiff not to suspect malpractice given trust inherent in doctor-patient relationship and doctor's repeated assurances of progress); *id.* at 76 (plaintiff's consultation with second doctor, who initially did not indicate that defendant-doctor had injured her, was factor weighing in favor of reasonableness of plaintiff's failure to suspect malpractice sooner); *cf. Mancuso v. Mancuso, supra,* 209 *N.J.Super.* at 59 (where plaintiff claimed to have developed Parkinson's disease as a result of automobile accident, the highly unusual nature of such a medical result and totality of the circumstances warranted application of the "equitable predicates of the discovery rule").

The Appellate Division recognized the legitimacy of plaintiff's claimed reliance on defendant's representations, but limited the objectively reasonable duration of such reliance to one year from the date of plaintiff's last visit. *See supra* at 62. In our view, however, plaintiff might reasonably have continued to believe for more than a year following her last visit defendant's statements that she would recover. We note that the evidence below revealed a conflict over the precise timetable defendant placed on plaintiff's recovery, *compare supra* at 60 (plaintiff asserted defendant told her recovery would take "a year or more") *with supra* at 59 (defendant stated he told plaintiff recovery would take up to a year), and the trial court made no finding resolving the dispute. Further, defendant allegedly advised plaintiff that the intermittent nature of her condition was indicative of continued healing, and plaintiff testified that

during the period following her last visit she relied heavily on this aspect of defendant's advice in continuing to believe she was recovering. *See supra* at 60. Whether plaintiff's subjective belief she was recovering, and therefore not inclined to file suit, could reasonably be maintained until December 1983 when she consulted Dr. Taft is a question in the first instance for the trial court.

Finally, the medical validity of defendant's assertions as of the time they were made was not considered below. Although plaintiff has not alleged that defendant intentionally provided false information, on remand the court may wish to ascertain whether defendant's prognosis and representations about the healing process were medically flawed, and to evaluate the equitable import of such a finding accordingly.

The judgment of the Appellate Division is reversed and the matter remanded to the Law Division for proceedings consistent with this opinion.

*For reversal and remandment*—Chief Justice WILENTZ and Justices CLIFFORD, HANDLER, POLLOCK, O'HERN, GARIBALDI and STEIN—7.

*Opposed*—None.