WILLIAM GRAVES AND JOYCE A. GRAVES, HIS WIFE, PLAIN-
TIFFS-RESPONDENTS, v. CHURCH & DWIGHT COMPANY,
INC., A NEW JERSEY CORPORATION, DEFENDANT-APPEL-
LANT.

Argued February 15, 1989—Decided June 1, 1989.

*Richard Galex* argued the cause for appellant (*Garruto, Galex & Cantor,* attorneys; *Richard Galex* and *Daniel L. Carroll,* on the briefs).

*Adrian I. Karp* argued the cause for respondents.

PER CURIAM.

The members of the Court being equally divided, the judgment of the Appellate Division is affirmed.

O'HERN, J., concurring.

This appeal presents an essentially factual controversy about the application of the discovery rule. "The history and principles underlying the discovery rule have been examined by us on numerous occasions." *Abboud v. Viscomi,* 111 *N.J.* 56, 62 (1988); *see Vispisiano v. Ashland Chem. Co.,* 107 *N.J.* 416, 425–27 (1987). No further elaboration is needed.

Suffice it to say that the rule's "essential purpose * * * is to avoid harsh results that otherwise would flow from mechanical application of a statute of limitations." [*Vispisiano, supra,* 107 *N.J.*] at 426 Accordingly, the doctrine "postpon[es] the accrual of a cause of action" so long as a party reasonably is unaware either that he has been injured, or that the injury is due to the fault or neglect of an identifiable individual or entity. *Id.* at 426–27; *accord Lynch v. Rubacky,* 85 *N.J.* 65, 70 (1981); *Lopez v. Swyer,* [62 *N.J.* 267, 274 (1973)]. Once a person knows or has reason to know of this information, his or her claim has accrued since, at that point, he or she is actually or constructively aware "of that state of facts which may equate in law with a cause of action." *Burd v. New Jersey Tel. Co.,* 76 *N.J.* 284, 291 (1978). [*Abboud v. Viscomi, supra,* 111 *N.J.* at 62–63.]

The linchpin of the discovery rule is the unfairness of barring claims of unknowing parties. Statutes of limitations are primarily statutes of repose. They are designed to stimulate litigants to pursue their actions diligently.

They penalize dilatoriness and serve as measures of repose. * * * When a plaintiff knows or has reason to know that he has a cause of action against an identifiable defendant and voluntarily sleeps on his rights so long as to permit the customary period of limitations to expire, the pertinent considerations of individual justice as well as the broader considerations of repose, coincide to bar his action. Where, however, the plaintiff does not know or have reason to know that he has a cause of action against an identifiable defendant until after the normal period of limitations has expired, the considerations of individual justice

and the considerations of repose are in conflict and other factors may fairly be brought into play. [*Farrell v. Votator Div. of Chemetron Corp.*, 62 *N.J.* 111, 115 (1973) (citation omitted).]

To reach a just accommodation of these considerations, courts have developed the so-called "discovery" principle adopted first in New Jersey in *Fernandi v. Strully*, 35 *N.J.* 434 (1961). All that we need determine in this case is whether the plaintiff, during the two years after the injury, reasonably was unaware that his internal injuries were due to the fault of the defendant's medicinal product.

I

We rely primarily on the facts set forth in the defendant's petition for certification, although there is little dispute about what happened.

On August 22, 1979, while vacationing at his summer home in Martha's Vineyard, Massachusetts, the plaintiff, William Graves, awoke sometime after midnight suffering from mild indigestion. (Joyce Graves also brings suit, but as her cause of action is dependent on her husband's, our references to "plaintiff" hereinafter will embrace both of their claims.) Mr. Graves could not find the over-the-counter medicines he customarily used for indigestion but remembered that as a child his mother had given him bicarbonate of soda. He walked from the bathroom into the kitchen and found the Arm & Hammer baking soda (also known as "bicarbonate of soda" or "sodium bicarbonate") in the kitchen cabinet. (We use "Arm & Hammer," the familiar trademark for the product, to refer to the corporate defendant, Church & Dwight Company, Inc.) Mr. Graves poured some baking soda into a glass, filled the glass with water, and drank several swallows. Even before he could put the glass down, he experienced terrible pain and collapsed to the floor. Plaintiff was rushed by ambulance to the Martha's Vineyard Hospital where he was diagnosed as having a perforated viscus, *i.e.*, a tear in the upper gastrointestinal tract region. At first, Mrs. Graves questioned whether surgery

should be performed at the island hospital. However, at about 2:20 a.m., the attending surgeon informed her that her husband's condition was critical and that he would die before he could be taken elsewhere. Plaintiff underwent surgery. The attending surgeon, Doctor Claydon, had to open up plaintiff's stomach to find out the cause of his pain. He found a rent or tear in the upper part of plaintiff's stomach near his esophagus that measured two and one-half inches long. The stomach had been torn open and its contents spewed into the abdominal cavity, creating the gravest risk of infection. After considering removal of the entire stomach, Dr. Claydon sewed up the tear in the stomach and stabilized plaintiff's condition. The surgical diagnosis was a perforated ulcer of unknown origin despite the fact that such ulcers usually appear at the bottom portion of the stomach and are of smaller size. As a result of the diagnosis, plaintiff was placed on a specialized diet and changed his manner of living to treat his ulcer.

At the hospital, plaintiff had included his ingestion of baking soda as part of his medical history. No medical report filed with the Vineyard Hospital asserted nor suggested that plaintiff's acute reaction was caused by any aspect of the baking soda. The case was obviously unusual for the staff of the Martha's Vineyard Hospital, and the cause was discussed at a regular staff meeting on the Friday following the operation. No member of the staff, which included gastroenterologists, questioned the role of the baking soda.

Plaintiff experienced more difficulties and underwent a series of corrective operations. A ventral hernia developed at the site of the original incision, and this and other complications required further hospitalization, primarily at the Georgetown University Medical Center, and on one occasion at the Martha's Vineyard Hospital. In fact, plaintiff underwent six separate operations in an effort to stabilize his condition. Although the records of these procedures often refer to the stomach rupture as "secondary" to the taking of bicarbonate of soda, no physician associated with the later care ever believed that the

condition was caused by the baking soda. In fact, one George-town University physician who took Graves' medical history testified that he wrote an exclamation point after the reference to the sodium bicarbonate to indicate his disbelief.

Four years after the incident, one of the plaintiff's co-work-ers saw a televised news account of a spontaneous stomach rupture. This friend quickly called the plaintiff who switched on his television but missed the show. Graves then went to the television station and asked to see a copy of the film clip. The film clip described the experience of Michael Webber, from the Washington, D.C. area, who claimed to have suffered an almost identical experience after ingesting baking soda. Plaintiff him-self was later interviewed by the news staff of the television station in a follow-up interview that ran on the metropolitan Washington news. The attorney for Webber called Mr. Graves. Graves asked this attorney if he thought he had a cause of action. The attorney replied that it sounded similar to his client's case. Plaintiff called Dr. Claydon, the surgeon who performed the first operation, and related the story to him. Dr. Claydon agreed that if it were scientifically possible for baking soda to cause rapid stomach expansion, then the Arm & Ham-mer was a possible cause of his injuries. This suit ensued.

Arm & Hammer moved to dismiss plaintiff's complaint on the basis of the statute of limitations because four years had passed since the night of the injury in August 1979. The motion was originally denied by the Law Division, because of the unusual nature of the causation of the injury, but the Appellate Division remanded for a more complete hearing. Rather extensive discovery has taken place, which gives us a sound record on which to base a discovery-rule decision.

On remand, the Law Division granted Arm & Hammer's motion to dismiss. In the Law Division's view, the plaintiff knew all the facts that equate with an actionable claim when the injury occurred. The syllogism ran thus: the plaintiff knew he had an injury and that he had taken baking soda. There was

available medical literature that could have supported the claim. Thus, he was in possession of facts that reasonably could have been equated in law with a claim against Arm & Hammer. The trial court found:

> Before August 22, 1979 and thereafter there existed sufficient information in the medical and scientific communities which was clearly capable of providing *a basis for a claim* against the defendant especially when such information was combined with the facts and circumstances leading to the event in question.

Moreover, the trial court found that plaintiff knew almost from the moment of injury that the bicarbonate of soda was the cause, as evinced by the fact that at subsequent medical examinations he always related his ingestion of baking soda prior to his stomach perforation. The court stated: "I find it most unlikely that plaintiffs never considered making a connection between the ingestion of baking soda and the stomach rupture." The Law Division noted that plaintiff's claims were time-barred by the statute of limitations even if plaintiff could prove that the defendant knowingly failed to warn the public about its product's dangers.

On appeal, the Appellate Division accepted the basic factual determinations of the trial court; they are essentially not in dispute. The Appellate Division differed, however, on the application of those facts to the law. 225 *N.J.Super.* 49, 54–55 (1988). The Appellate Division concluded, similar to the Court in *Lynch v. Rubacky*, that "[t]he shortcoming of the determination below rests not so much upon the facts as determined by the trial court as upon the legal significance of these facts under the discovery rule." 85 *N.J.* 65, 70 (1981).

The Appellate Division ruled:

> [A] layman should not be charged with knowledge of cause and effect, even cause and effect which he may suspect, when the physicians who are treating him and who have the same factual information on which his own suspicions are based completely discount the validity of those suspicions. [225 *N.J.Super.* at 56.]

It thus concluded that plaintiff cannot be held to have been constructively aware of the causal connection between the bicarbonate of soda and his medical condition. *Id.* at 57.

## II

The "discovery rule" is a rule of equity that allows the tolling of the statute of limitations "when a party is either unaware that he has sustained an injury or, although aware that an injury has occurred, he does not know that it is, or may be, attributable to the fault of another." *Tevis v. Tevis*, 79 *N.J.* 422, 432 (1979). "One's awareness of an injury or deleterious condition does not always equate with the accrual of a cause of action. At times, as in this case, 'the inquiry must focus upon fault as well as injury where the awareness of the fault is not self-evident in the injury.'" *Vispisiano, supra*, 107 *N.J.* at 427 (quoting *Jarusewicz v. Johns–Manville Prods. Corp.*, 188 *N.J. Super.* 638, 643 (Law Div.1983) (citation omitted)).

Thus the Appellate Division asked, in effect, where did the record demonstrate plaintiff's "awareness of the fault" in the baking soda. Of course, it is easy now to equate the two (baking soda and defective product), but was it easy then? To suggest that the plaintiff should have known that the baking soda could cause a stomach rupture would attribute to him knowledge superior to that of all the physicians who treated him. This includes the extraordinarily able physician who had performed the life-saving surgery at the Martha's Vineyard Hospital, as well as the other doctors on that staff, and the physicians at the Georgetown University Medical Center, none of whom had ever suggested that his ruptured stomach was attributable to an adverse reaction to the baking soda. Even Dr. Taylor, the emergency room attendant at the Martha's Vineyard Hospital, who claimed plaintiff and Dr. Claydon had linked the bicarbonate of soda with the pain, did not himself believe that there was a causal relationship. Not one of them ever said to the plaintiff: "You know that baking soda was the thing that did you in. It blew up in your stomach."

It would have required as well a greater knowledge than that possessed by the Chief Executive Officer of the Arm & Hammer, who genuinely believed that the product was incapable of

causing such a result, and testified that "I would have doubted it to myself." It would have required a greater knowledge than that of the Research and Development Director of Arm & Hammer Company, who prior to Dr. Fordtran's report (Fordtran Study) conducted after the Webber case, stated that he "did not know of the stomach—of the subject of stomach rupture at all."

Plaintiff would not have been enlightened if he had been diligent in presenting his claim to Arm & Hammer. Almost invariably consumers who reported such incidents to Arm & Hammer were told that this could not have happened because the product had been shown to be safe by consumer use for more than one hundred years. Another consumer who was hospitalized on several occasions for severe stomach pains and experienced holes in her intestine after ingesting a bicarbonate of soda and water mixture had complained to Arm & Hammer. She was assured by the company in 1983:

> We're sorry to learn that you believe ARM & HAMMER Baking Soda to be the cause of the medical problems you've been experiencing since 1973.
>
> We would like to assure you that the Food and Drug Administration (FDA) panel on over-the-counter drugs recognizes Baking Soda as a safe and effective antacid. Taken as directed (one-half teaspoon of Baking Soda in ½ glass of water), it alleviates heartburn, sour stomach and acid indigestion. Baking Soda neutralizes acids in the digestive system which cause discomfort.

One of the anomalies of this case is that defendant's product is such a common household staple (the antacid applications of the product represent but one percent of the consumer use) that its safety for human health seems more to have been assumed than demonstrated. It is a part of the defendant's corporate culture. As the Marketing Director explained, the product is safe because people have been using it for 140 years.

Once revealed, there is really a very simple point that is at issue here. Stomach acids are necessary to the digestive process; they break up the foods in the stomach. When out of balance, they can be distressful. Every one of us is conversant with the symptoms of indigestion. We recall the familiar commercial messages of an antacid competitor: "I can't believe

I ate the whole thing." The discomfort is often attributed to an excess of stomach acidity. When ingested, sodium bicarbonate ($NaHCO_3$) reacts with and neutralizes stomach acids. However, in this process, the sodium bicarbonate releases carbon dioxide gas. Under certain conditions excess gas pushes against the stomach walls, and when those stomach walls are either weakened or already distended with food, the stomach can burst. Should this occur, the risks are catastrophic. A stomach rupture poses an extraordinary risk of fatal consequences. If not properly attended, there is a greater than 90% chance of fatality.

With the exception of one study commissioned on behalf of Arm & Hammer after the Webber litigation was instituted, no studies have ever been made to determine the proper dosage of the product. At various times, the Arm & Hammer box recommended "half a teaspoon in half a glass of water" or "½ teaspoon in a glass of water." There being no minutes of any formal meeting by the company's executives, no witness was able to explain how or why these dosage changes were suggested.

In its 1972 submission to the Food and Drug Administration (FDA), in connection with the FDA investigation of over-the-counter antacid products, Arm & Hammer submitted a report based on readings in the literature that there is no danger attributable to ingestion of this product. The report concluded that parents need not be warned even with respect to use of the product by children, such as is done in the label that appears on aspirin or similar products. The FDA approved of sodium bicarbonate as an antacid in 1974. *See* "Antacid Products for Over-the-Counter (OTC) Use," 39 *Fed.Reg.* 19,874 (1974) (codified at 21 *C.F.R.* pt. 331).

Our dissenting members emphasize certain factual findings as being dispositive of the issue. But the significance of these factual findings flows only from the hindsight that we now

have of the scientific possibility that baking soda indeed could have been the cause of the stomach rupture.

As the plaintiff put it, he was simply trying to explain to the medical providers "All I did was take baking soda," not "I got this from baking soda." His wife said: "He thought he had taken a remedy. He had no idea that what he had taken could have been the cause of anything." His physicians testified that his inclusion of the baking soda in the patient history was part of the chronology of events but not part of the cause of the event. The Georgetown University Hospital physician who had placed the exclamation point in the hospital chart for "54-year-old WM * * * with history of gastric rupture secondary to sodium bicarbonate ingestion (!) two years ago," testified that his notation merely implied his surprise. "The phrase gastric rupture secondary to sodium bicarbonate ingestion would have been a phenomenon that at the time I had been unaware of, and my recollection of my interpretation of my use of that punctuation at that point was that I was somewhat surprised that that phenomenon could even occur."

The surgical resident at Georgetown University Hospital similarly stated that "it was skepticism on my part that I didn't write 'caused by' because I wasn't aware of this particular complication of sodium bicarb." And finally, the expert witness who described the causal connection to the product stated in his report offered at the hearing that

despite my extensive experience in Internal Medicine and Gastroenterology, I was unaware of the association prior to seeing this woman [a plaintiff in a prior case]. In addition neither the patient [in that case] nor the attorney were aware of this association. I also spoke to a large number of my colleagues at the University and in private practice, and none of them were aware of the association.

All that the dissent sees so clearly now was not so clear then. No one ever suspected the bicarbonate of soda to have been the cause of the stomach perforation in 1979. The Chief Chemist of Arm & Hammer "never even considered * * * the threat of spontaneous rupture of the stomach" until sometime after 1980. (He was not sure if the Webber case was the trigger.) Defen-

dant attempts to exploit the fact that plaintiff is a man of considerably broad experience, with an excellent education. Why should this be turned against him? One might as well ask why such a person, indeed one who escaped from Corregidor as a child at the start of World War II, would not have instituted a law suit had he known that he had a cause of action. The answer seems quite clear. He had no idea that a defect in the familiar household remedy could have caused his stomach rupture.

In short, the company continues to believe in the inherent safety of sodium bicarbonate as an over-the-counter medicine to relieve stomach indigestion. Paradoxically, its present warning, developed after Dr. Fordtran's study, recommends that it should not be used when it would be ordinarily needed—that is, when one has a full stomach. In terms of the overall fairness of the situation, the scale is not tipped against defendant. Arm & Hammer was candid to state at oral argument that it could not point to any prejudice that it will sustain in defending the case by reason of delay. Arm & Hammer Baking Soda is an extraordinary product, which serves a variety of household uses including the making of chocolate chip cookies, the removal of odors from refrigerators, and use in brushing teeth. As the label once said, the product is indeed a miracle worker. All that is in question here is whether there is some danger to its use as an antacid.

III

Applying well-settled principles, the Appellate Division concluded that the record, viewed in the prism of the equitable considerations that underlie the discovery rule, called for the application of the discovery rule here. Graves was not a person like Ms. Viviano, who had her hand crushed in a record press. She knew the defect in the machine caused the injury, though she may not have been exactly certain of which part of the machine. *Viviano v. CBS, Inc.,* 101 *N.J.* 538 (1986). Nor is he

like the plaintiff in *Burd v. New Jersey Tel. Co.*, 76 *N.J.* 284 (1978). Recall that in *Burd* it was the view of the trial court that the plaintiff had to be informed by an attorney that he had a cause of action. *Id.* at 290–91. Rather, our Court said it is not whether the plaintiff learns "the state of the law positing a right of recovery upon the facts already known to or reasonably knowable by the plaintiff," but rather the state of the facts that equate with such a cause of action. *Id.* at 292. In *Burd*, plaintiff's counsel was concededly aware of the causal relationship between the offending product and his injury prior to the running of the two-year period of limitations. In that context, the Court was satisfied that the plaintiff's repeated exposure to the product and his repeated bad reaction to the product, along with the cessation of the symptoms when the exposure ended, furnished a substantial credible basis for believing that the exposure to the fumes of the product was related to the medical injury that occurred. *Id.* at 292–93.

For all that plaintiff knew here, even if he connected his injury to the baking soda, it could easily have been thought an atypical reaction to a benign product. Have we not become ill from a combination of healthful foods? The difference between our view and the dissent, as between the trial and appellate courts, then, is not over basic factual findings but over inferences to be drawn from them. That plaintiff suspected the baking soda to have been a cause of his injury is not the determinative factor. He may have suspected as well the two martinis or his wife's chili (some of her friends plagued her about this). Consumption of these items was part of his patient history. The determinative factor is that he had no awareness of any causative fault or defect in the baking soda, nor was it reasonable to charge him with such knowledge. In some ways plaintiff is like Mrs. Abboud, who knew she had suffered an injury, persistent pain, from the dental procedures. She was simply misled by her treating physician to believe that this was the normal thing and therefore she did not attribute the injury to the fault of another. *Abboud v. Viscomi, supra,* 111 *N.J.*

56. Although plaintiff was not deliberately put off the trail of his suspicions by a culpable medical defendant, as was Marie Abboud, plaintiff was as effectively misled. For all that he was told, he had suffered an injury that was attributable to an ulcer.

He resembles as well Mary Borello, who experienced a burning sensation in her nose, dizziness, and headaches from what she attributed to defendant's faulty furnace. *Borello v. U.S. Oil Co.*, 130 *Wis.*2d 397, 388 *N.W.*2d 140 (1986). In *Borello*, the defendant argued that the plaintiff's "cause of action accrued at a very early date" because the plaintiff believed that the furnace caused her injuries. *Id.* at 398, 388 *N.W.*2d at 141. The Wisconsin Supreme Court, however, found that because "at every turn, she was told by professionals, who were assumed to be competent to diagnose her ailment and its cause, that the furnace fume problem was irrelevant," she was given the benefit of the discovery rule. *Id.* at 399, 408, 388 *N.W.*2d at 142, 151.

Nor is the shattering impact of the injury, the traumatic nature of which defendants emphasize here, a bar to the application of the discovery rule. In *Raymond v. Eli Lilly & Co.*, 412 *F.Supp.* 1392 (D.N.H.1976), *aff'd*, 556 *F.*2d 628 (1st Cir.1977) (relying on questions certified at 117 *N.H.* 164, 371 *A.*2d 170 (1977)), the plaintiff Patricia Raymond, after taking birth-control pills, suffered hemorrhaging in both eyes that left her legally blind. She knew that she had taken the pills, and she knew that she was severely injured. But "she was never given any indication by any doctor that there was a causal connection between the birth control pills and the hemorrhage in her left eye." 412 *F.Supp.* at 1395. The District Court distinguished *Raymond* from other defective product cases because the injury sustained was not immediately attributable to the fault of another:

Here, the plaintiff alleges that she had no reason to suspect that her blindness was due to the fault of another and was, in fact, advised by her physicians that it was probably idiopathic. In other words, plaintiff knew she had been

harmed, but not that she had been injured in the legal sense that she had sustained an invasion of a protected interest. [*Id.* at 1400.]

Notwithstanding that she was possessed of all the facts that equate in law with a cause of action, she was not barred from bringing her cause of action. *Id.* at 1402–03. In contrast, in *Fidler v. Eastman Kodak Co.*, 714 *F.*2d 192, 197 (1st Cir.1983), it was the fact that a physician informed the plaintiff that "a residuum of [defendant's product] in her spine from myelograms was the cause of her symptoms [of crushing facial pains]" that barred her cause of action.

Here, in seven surgeries, no physician ever suspected or suggested the causal connection between the baking soda and the stomach tear (excepting Dr. Taylor's testimony that Dr. Claydon told him that he had read literature about bicarbonate of soda and spontaneous stomach rupture, a fact that Dr. Claydon did not confirm). It is a little unrealistic then to say that the patient should be constructively aware that a defect in the product caused his condition. It would be especially ironic to reach that conclusion of imputed knowledge when the research and development teams of the manufacturer were equally unaware of the product defect.

As noted, to allow the plaintiff to bring suit does not in any way prejudice the defendants. Plaintiff may not have much of a cause of action here. He may have misused the product. He is a little uncertain on the details of how much of the powder he sprinkled into the cup on the night when he took the bicarbonate of soda. Arm & Hammer stoutly defends the safety of its product. Its records continue to show its generations of use without incident. So there is no prejudgment of the plaintiff's case here. All that plaintiff seeks is to assert a claim. The public may have a greater interest in the outcome of his case than he.

The discovery rule does not merely excuse delay, but also serves to reinforce important goals of the law.

One of the principal justifications for applying the discovery rule in medical malpractice cases is that it provides protection against substandard medical

care. * * * Protection against the manufacture and distribution of harmful drugs is also desirable and necessary. The additional burdens placed upon the defendant by the discovery rule are justified if they cause the defendant to conform to a higher standard of care. *Fernandi v. Strully,* 35 *N.J.* 434, 173 *A.*2d 277 (1961) * * *. [*Raymond v. Eli Lilly & Co., supra,* 117 *N.H.* at 170, 371 *A.*2d at 177 (citations omitted).]

## IV

To sum up, the Appellate Division has changed no law in its disposition of this case, nor, despite the disagreement of our dissenting members, have we. "The essential purpose of the rule is to avoid harsh results that otherwise would flow from mechanical application of a statute of limitations." *Vispisiano v. Ashland Chem. Co., supra,* 107 *N.J.* at 426. Achieving its purpose is never easy. Our Court split five to two in the seminal case of *Fernandi v. Strully, supra,* 35 *N.J.* 434 four to three in *Burd v. New Jersey Tel. Co., supra,* 76 *N.J.* 284 four to two in *Tevis v. Tevis, supra,* 79 *N.J.* 422 and five to two in *Lynch v. Rubacky, supra,* 85 *N.J.* 65. We are unable to agree here.

We granted certification to consider the questions whether the Appellate Division improperly extended the holding of *Vispisiano v. Ashland Chem. Co., supra,* 107 *N.J.* 416, to a case involving instantaneous traumatic injuries, and whether the holding in the present case is in conflict with the holding of *Burd v. New Jersey Tel. Co., supra,* 76 *N.J.* 284. We are satisfied that there is no conflict with *Burd* in the circumstances of this case nor unwarranted extension of *Vispisiano.* We have no black-letter rule as do some jurisdictions, *see LePretre v. Petrie Bros.,* 113 *Ill.App.*3d 484, 69 *Ill.Dec.* 334, 447 *N.E.*2d 551 (1983), that the discovery rule never applies in the cases of a sudden traumatic event. It is the unfamiliar nature of the accident that makes this case stand out. The legal principles are familiar. A commentator has observed:

The years preceding [*O'Keeffe v. Snyder,* 83 *N.J.* 478 (1980)] found the New Jersey courts expansively fashioning the contours of the discovery rule, extending that doctrine's equitable reach whenever rigid adherence to the rule of law would result in manifest injustice. Peculiar factual conditions in diverse

categories of actions, from personal injury and property damage suits to professional malpractice claims, permitted a finding that the plaintiff could not reasonably have known on the date the harm was inflicted that he or she had sustained an injury, or that *the injury was attributable to the fault of another.* These cases shared as their common ground circumstances strongly favoring the grant to the plaintiff of equitable relief. [Franzese, " 'Georgia on my Mind'—Reflections on *O'Keeffe v. Snyder,*" 19 *Seton Hall L.Rev.* 1, 9 (1989) (emphasis added) (footnotes omitted).]

We find those circumstances here.

Chief Justice WILENTZ and Justice STEIN join in this opinion.

CLIFFORD, J., dissenting.

Against the overpowering tide of facts and the strong current of well-established law our concurring colleagues swim to save plaintiffs' case from dismissal on statute-of-limitations grounds. The novel idea floated today seems to be that because the doctors who treated plaintiff William Graves (reference hereinafter to "plaintiff" is to William) may not have accepted plaintiff's theory of causative fault, plaintiff should not be barred by his own certain "knowledge" (correct or incorrect, it does not matter), gained at the moment of onset of his excruciating distress, that bicarbonate of soda caused his stomach to explode. Just short of five years after the cause of action arose and three years beyond the period that the legislature has fixed for starting suit, see *N.J.S.A.* 2A:14–2, plaintiffs filed their complaint.

The conventional two-year period of limitations is susceptible of modification by the "discovery" rule, but "only to the extent of postponing the commencement of accrual of the cause of action until plaintiff learns, or reasonably should learn, the existence of that *state of facts* [that] may equate in law with a cause of action." *Burd v. New Jersey Tel. Co.,* 76 *N.J.* 284, 291 (1978). Statement of the rule reveals its fact-sensitivity. In determining whether the circumstances permit this plaintiff to resort to the "discovery" rule, we should be mindful of the following undisputed facts:

(a) Both plaintiff and his wife are well-educated and employed by National Geographic Magazine, he as the Senior Assistant Editor in charge of expeditions and underwater archeology, she as an Assistant Vice President.

(b) On the day in question, August 22, 1979, plaintiff's lunch consisted of two bowls of soup and cookies, preceded by a vodka martini. Plaintiff's dinner, accompanied by red wine, consisted of homemade chili, cornbread, and salad, preceded by two vodka martinis and "Fritos," and followed by "Tahiti" cookies and iced cognac.

(c) When plaintiff awoke about five hours after dinner, suffering from indigestion, he drank a mixture of water and defendant's baking soda. After several swallows he experienced what he described as "instantaneous and massive pain," the "worst pain" he had ever endured in his life, so severe that it drove him to his knees and produced cries that awakened his wife. As she sought to tend to and comfort him after an ambulance had been summoned, plaintiff, apprehensive of losing consciousness, instructed his wife to tell the medical attendants:

[A]ll I did was take baking soda. Some Arm & Hammer baking soda.

(d) In speaking to the emergency-room physician on arrival at the hospital, both plaintiff and his wife attributed the sudden onset of his pain to plaintiff's ingestion of baking soda. While undergoing examination in the examining room plaintiff again attributed his acute pain to the baking soda. According to the emergency room physician, plaintiff "felt strongly" that the baking soda had "played a role" in his pain, which was experienced "very quickly after taking the baking soda." The information was given "several times" that "the baking soda had caused the pain." According to the physician, plaintiff pinpointed the baking soda as the source of his problem in an "agitated and flamboyant" manner, not by way of "a second thought or a weak feeling."

(e) Plaintiff testified that he had never had any reason to believe that he had an ulcer. Despite the diagnosis in the hospital record of "gastric rent secondary to gastric ulcer," the physician who so skillfully performed life-saving surgery on plaintiff did not think he was operating on an ulcer. He could not identify any ulcer or ulcerous tissue in the course of the surgery, and both the location and the large size of the tear on the lesser curvature of plaintiff's stomach were atypical for an ulcer.

(f) In April 1981 plaintiff was admitted to Georgetown University Hospital on account of a subphrenic abscess. He gave one of his physicians a history of gastric rupture secondary to sodium bicarbonate ingestion.

(g) About a year later, in March 1982, plaintiff returned to Georgetown University Hospital. At that time he told a nurse, as verified by her notation at the time, that he "[h]ad a repair of ruptured stomach secondary to bicarb ingestion in the summer of 1979." On the same occasion he gave a surgical resident a history of having suffered a "tear in the anterior stomach following ingestion of sodium bicarbonate." The resident understood plaintiff to be attributing the cause of the rupture to ingestion of baking soda.

Small wonder, then, in view of the foregoing, that the trial court, following the hearing required by *Lopez v. Swyer*, 62 *N.J.* 267 (1973), rejected plaintiff's claim that he did not know and could not have known "that *state of facts* [that] may equate in law with a cause of action"—the *Burd* formula—until he saw the Webber television tape in October 1983, as described in the concurring opinion, *ante* at 260. After first pointing out that plaintiff's expert established that both before and after plaintiff's 1979 experience there were reported incidents of gastric rupture following the ingestion of baking soda, and that the medical literature had for at least fifty years identified sodium bicarbonate as a cause of spontaneous stomach rupture, the trial court made the following critical findings of fact:

1. Plaintiff made the connection between the ingestion of baking soda and the ruptured stomach "almost immediately following the event." He considered it important to convey to the medical people the information that his excruciating pain followed immediately his ingestion of defendant's product.

2. Plaintiff was not "distracted" by the operating physician's diagnosis, as appears in the first hospital record, of "gastric rent secondary to gastric ulcer." Specifically, the assertion that plaintiff and the operating physician "did not at the very least discuss the fact that [the physician] did not on August 22, 1979, think he was operating on an ulcer" was incredible.

3. Plaintiff knew within the statute-of-limitations period that he had "a basis for an actionable claim" against defendant.

In the face of these formidable findings, some of which rest on appraisals of credibility, the Appellate Division and our concurring brethren have now concluded that plaintiff did not really "know" of the causative fault of defendant's product until he viewed the Webber television tape. That tape contained the report of a physician's statement in support of the relationship between defendant's product and spontaneous rupture of the stomach, concluding with the observation that since 1926 six or seven cases of spontaneous stomach rupture had been reported in the medical literature. The Appellate Division acknowledged that

> [although] the phenomenon of extreme abdominal pain immediately following ingestion of sodium bicarbonate might well cause an intelligent person to wonder if there was a causal as well as a chronological relation, the suspicion so engendered cannot be said to rise to the level of actual or constructive knowledge if his own physicians fail to recognize a causal connection. [*Graves v. Church & Dwight Co., Inc.*, 225 *N.J.Super.* 49, 57 (1988).]

In the same vein, the concurring opinion rejects the trial court's conclusion in respect of what plaintiff "knew," because "[t]o suggest that the plaintiff should have known that the baking soda could cause a stomach rupture would be to attribute to him a knowledge superior to that of [his physicians] * * *." *Ante* at 262.

And so, despite the concurring members' effort to lull the reader with the reassurance that this appeal concerns no more than a little old "factual controversy," *ante* at 257, really nothing to get excited about, nothing new, *ante* at 270, in fact our colleagues' effort would mark a major departure from settled law, not just in its elbowing-aside of the trial court's findings, but more significantly in its establishing a new test for application of the "discovery" rule. Henceforth the cause of action in a personal injury case would be deemed to arise not when plaintiff is aware of the facts that may equate in law with a cause of action, but rather when plaintiff and his or her physicians are prepared to *prove* the medical connection. And so while ignorance of the law remains no excuse, the professional's medical "unawareness" (no need to resort to the pejorative "ignorance") would act to excuse a plaintiff's failure to file a complaint in time. Before disallowing application of the discovery rule, a court would have to conclude not simply that *plaintiff* was aware of facts bespeaking the causative fault of the offending instrumentality, but that his *physicians* as well were prepared to prove that plaintiff's theory was correct, that plaintiff's understanding was in fact accurate. That change in our law would be not merely significant, it would be avulsive; and anyone who really believes that the concurring opinion represents nothing more than some fine-tuning of our existing rule and does no violence to precedent should straightaway repair to Brooklyn, there to take immediate advantage of a golden opportunity to strike a bargain on a swell old bridge.

It seems to me that our traditional formulation of the rule is sufficient as is, and that adding to it yet another layer of required proof would unnecessarily and unwisely complicate an area of our law not renowned for its simplicity. As far as plaintiff was concerned, he "knew" from day one—from *instant* one—that his difficulties stemmed from his ingestion of defendant's product. It takes not much deductive reasoning to conclude that if ingestion of an antacid, designed to relieve stomach distress, immediately produces excruciating stomach

pain, there may be something wrong with the antacid: either the chemical formula is bad or the batch from which the offending dosage was taken is bad, an impression well fortified in this case by the absence of any reason for plaintiff to believe that he had an ulcer and the later reinforcement of that opinion by the failure of discovery of an ulcer during surgery. There may of course be other possible causes of the dramatic result, but here the plaintiff never wavered from his original conclusion—the same conclusion that forms the basis for this suit. He was not put off ("distracted," as the trial court put it in its unchallenged finding) by his physician's unsupported diagnosis. He continued in the years following the event to include in his medical history the connection between defendant's product and his stomach rupture. And he ultimately sued the very same defendant whose product he named as he lay writhing on the floor in pain.

The concurring opinion makes the "discovery" rule turn on an exercise in epistemology: what is "knowledge"? For me it is not necessary that it be established in a *Lopez* hearing that a plaintiff is correct in his or her theory of causative fault, for if that were a requirement, a defendant seeking to defeat the "discovery rule" modification of the statute would have to prove the plaintiff's case. It is quite enough that a plaintiff know, within the statutory period, the facts of injury and causal relationship that *may* afford a cause of action—a component of our "discovery" rule that serves to distinguish our law from the demonstrably different law of other jurisdictions to which the concurrence resorts, *ante* at 268–269, in its effort to find *some* support *somewhere* for its theory, so plainly foreign to our own well-established and long-accepted formulation of the "discovery" rule.

Despite his physicians' unawareness of the critical medical phenomenon that plaintiff alleges is at the heart of his case, the record shows that in fact that phenomenon has been reported in the medical literature for over half a century. If our concurring colleagues' medicine is accurate, as their law manifestly is

not, the explanation for plaintiff's plight is so disarmingly elementary as to make one wonder how any ninny could *not* know of the hazards of taking defendant's product on a full stomach. See *ante* at 263–264: (a) indigestion can be produced by stomach acidity; (b) sodium bicarbonate reacts with and neutralizes stomach acids, but (c) in the process the bicarb releases carbon dioxide gas, which (d) sometimes pushes against the stomach walls, which (e) can burst if weak or distended with food. As the concurrence says, "very simple." *Ante* at 263.

In a word, plaintiff's original—and current—theory of the case is not "off the wall"; it is not as if plaintiff were claiming that as a result of his use of a defendant-manufacturer's razor blade, he came down with kidney stones or Dupuytren's contracture immediately after shaving!

Finally, this case is readily distinguishable from *Vispisiano v. Ashland Chemical Co.*, 107 *N.J.* 416 (1987), *not* because that case involved a toxic tort (I agree with the Appellate Division that the *Vispisiano* principle should not be so confined), but because unlike Graves, the plaintiff in *Vispisiano* had only the foggiest idea of the connection between his medical condition and his brief employment at a toxic-waste disposal site. There, as the Appellate Division points out, the medical cause was "arcane." 225 *N.J.Super.* at 56. There was nothing "arcane" about the connection here: Graves drank the stuff and dropped to the floor. He perceived the connection immediately. I would hold his claim barred by the statute of limitations, wherefore I vote to reverse.

POLLOCK and GARIBALDI, JJ., join in this opinion.

*For affirmance*—Chief Justice WILENTZ, and Justices O'HERN and STEIN—3.

*For reversal*—Justice CLIFFORD, Justice POLLOCK and Justice GARIBALDI—3.