239 N.J. Super. 415 (1990)
571 A.2d 975
NORMA BRIZAK AND GEORGE BRIZAK, PLAINTIFFS-RESPONDENTS,
v.
EMANUEL NEEDLE, DEFENDANT-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Argued January 8, 1990.
Decided March 16, 1990.
*417 Before Judges J.H. COLEMAN, BRODY and SKILLMAN.
Francis B. Schultz argued the cause for appellant (Frederick W. Stevens, attorney; Francis B. Schultz, on the brief).
Joe Maran argued the cause for respondents (Maran and Maran, attorneys; Joe Maran, on the brief).
The opinion of the court was delivered by BRODY, J.A.D.
Plaintiff Norma Brizak (plaintiff) alleged in her complaint that defendant, a personal injury attorney, "negligently represented plaintiffs and failed to file a [medical malpractice] law suit against Mohammad Shafi, M.D. prior to the expiration of *418 the statute of limitations on November 1, 1984."[1] In answer to one of several special interrogatories the jury found that defendant was "negligent in his representation of plaintiff on her claim against Dr. Shafi for medical negligence." In answer to another interrogatory the jury found that defendant's negligence was "a proximate cause of plaintiff's failure to timely sue Dr. Shafi for damages." The jury awarded plaintiff damages in the amount of $35,000. Defendant appeals.
Although the parties agree that the "discovery rule" delayed accrual of plaintiff's claim against the doctor until sometime after he had last treated her, they do not agree on the date of accrual. This appeal requires us to consider whether an attorney has the duty to investigate the basis for a client's medical malpractice claim, and the scope of his duty to protect the client from the statute of limitations where the "discovery rule" applies. We must also consider whether plaintiff's claims were properly given to the jury even though she presented no expert legal testimony.
Plaintiff sustained a complete and comminuted fracture of the left humerus when she fell in her home on May 17, 1981. The indicated treatment, as described by plaintiff's medical expert Dr. Robert Tuby, calls for aligning the fractured ends of the bone and joining the fragments through open reduction surgery, and fixing them in place with a combination of pins and a plate held in place with screws. Instead of using that procedure, Dr. Shafi treated plaintiff in the emergency room of a hospital by simply placing her arm in a hanging cast. The fractured ends never united. In time it became too late medically to correct the poor result.
Dr. Shafi conceded at trial that the procedure he used was "second-best," but testified that plaintiff refused to undergo an *419 open reduction. However, plaintiff and two of her adult daughters, who accompanied her whenever she visited Dr. Shafi, testified that the doctor did not offer the option of an open reduction.
The jury specially found that Dr. Shafi did not "advise plaintiff, Norma Brizak, of the need to undergo surgery for her left arm." Defendant's medical witness, Dr. Albert Willner, expressed the opinion that Dr. Shafi did not deviate from accepted standards of medical care. However, he rested his opinion on the assumption, which the jury rejected, that the doctor had advised plaintiff "of the type of injury and that she did not wish to have any other treatment rendered to her except that of a cast application."
The issue in the medical malpractice claim was therefore not whether Dr. Shafi departed from an accepted standard of medical care, but simply whether he advised plaintiff to undergo an open reduction. Until the facts were investigated, however, neither plaintiff nor defendant could have surmised that the ultimate issue would merely be credibility.
The issue in the legal malpractice claim was whether, after being engaged by plaintiff to represent her, defendant diligently investigated the facts so that he could have commenced a timely action against the doctor.
Dr. Shafi last treated plaintiff for the fractured humerus on July 10, 1981. Over a year later, on September 3, 1982, plaintiff's hip was severely fractured when she was a passenger in a one-car accident. The same Dr. Shafi set the hip through an open reduction. About two months later, defendant was at plaintiff's home to consult with her adult son, whom he was representing in a matrimonial matter. While there he first met plaintiff who was still on crutches. She told him of her automobile accident and engaged him to represent her in an action against the driver.
During that conversation with defendant, plaintiff mentioned that she was still suffering from the effects of the broken arm. *420 She complained that she could not raise the arm above the level of her shoulder. The date of that conversation, sometime toward the end of October 1982, forms the basis of the allegation in the complaint that the limitations period for suing the doctor expired on November 1, 1984. However, plaintiff did not sign an agreement to retain defendant respecting her claim against the doctor until December 5, 1983, about the same time that defendant reached a settlement of plaintiff's automobile accident claim.
Defendant assigned the malpractice matter to an associate who had been handling plaintiff's automobile accident claim. The associate had previously learned from Dr. Shafi that plaintiff was suffering the effects of an unhealed fractured humerus. Dr. Shafi had sent the associate a final medical report of plaintiff's hip injury, dated November 8, 1983, in which he noted that he had treated plaintiff for a fractured humerus until July 10, 1981, "at which time the fracture had not fully healed and a delayed union was considered." Elsewhere in the report the doctor included "Nonunion fracture proximal humerus, left" in his description of plaintiff's physical condition when he last saw her on September 15, 1983. The file that defendant opened for plaintiff's claim against the doctor contains an early entry, apparently in the associate's hand, that reads, "Hanging cast instead of a pin." The associate did not testify.
It thus appears that early in his representation of plaintiff, defendant, or at least his associate, knew that plaintiff's fractured humerus had not healed under Dr. Shafi's treatment and that the bad result may have had something to do with the doctor's use of a hanging cast instead of pins to fix the fracture. Defendant's office did little to investigate these indications that Dr. Shafi's treatment was malpractice.
The first action defendant took after plaintiff retained him in December 1983 was to send the hospital a letter dated May 31, 1984, requesting a copy of the complete record of her emergency room treatment in May 1981 for the fractured humerus. *421 The hospital sent defendant a copy of the record, including an X-ray report but not the X-rays themselves. Defendant made no further attempt to obtain the X-rays, which were in Dr. Shafi's possession. When asked why he did not obtain the doctor's office records, defendant testified that the emergency room records were all he needed because "the treatment that was involved, that is the procedure, took place at the hospital." The doctor's office records included not only the X-rays but an entry dated July 10, 1981, in which he noted that he had discussed with plaintiff's daughter the need for an open reduction because of the "completely displaced fracture."[2]
After receiving the hospital records in June 1984, defendant did nothing more until March 1985 when he visited Dr. Michael Och, a long-time friend, at his home and obtained his oral opinion. Dr. Och is a radiologist and not an orthopedic surgeon. Although acknowledging that it would be "a deviation from accepted standards of medical practice not to review the X-rays or consult with a radiologist before making a diagnosis and making a recommendation for treatment," Dr. Och testified that all he needed to judge Dr. Shafi's treatment was the X-ray report that defendant had shown him. That report reads as follows:
RIGHT HUMERUS[[3]]
E 1195
Views of the right humerus in the AP and lateral projection shows a comminuted fracture of the right humeral neck with the humeral shaft distal to the fracture fragment being directed slightly superiorly. In addition, there appears to be a rotatory component to the humeral head.[[4]] No obvious dislocation is
 seen. 5-19-81 B. TERRY, M.D./mvc
*422 After examining the report and considering the treatment noted in the emergency room record, Dr. Och advised defendant that he "didn't see any apparent reason for any deviation from normal." Dr. Och testified that having followed fractures of the humerus for many years, "most of the cases that I have seen have been treated with hanging casts." However, on cross-examination he acknowledged,
I do not have any experience with open reduction. I have seen X-rays with metallic fixation devices and I assume they are used properly.
When defendant was asked on cross-examination whether he consulted any of the services that review medical records to evaluate medical malpractice claims and provide expert testimony if warranted, he testified as follows:
Q. Did you avail yourself of that service?
A. Once I knew there was indeed a basis for medical malpractice, I would consider it. I would consider it. Although I might say that there have been some other medical malpractice cases where I tested that type of service and I was very sorrowly disappointed with the way they tried to analyze the problem.
Q. Now, you have testified that you know it's difficult to obtain medical testimony in a malpractice case, is it not?
A. I think that's a fair statement, yes.
Q. And you testified that most doctors don't want to get involved?
A. That's correct.
Q. But there are physicians, are there not, that do evaluate malpractice cases?
A. Yes.
Q. And they are a group separate and distinct from those doctors, majority of doctors who do not want to get involved?
A. My experience has been that the best witness is not a professional witness that goes to court all the time and rarely, if ever, practices in their specialty. My experience has been when you've got a legitimate doctor who's involved in every day taking care of people and is willing to go to court because of what another doctor did to a patient, that's your best type of witness, and I would prefer that type of witness any day of the week.
Q. Isn't it true, Mr. Needle, that in the practice of law, in the handling and prosecution of medical malpractice cases, that doctors do not want to testify against one another; isn't that so?
A. Generally that is true.
About a month after his March 1985 conversation with Dr. Och, defendant suggested to plaintiff that she consult a physician of her choice about her arm, without disclosing to the *423 physician that she was seeking an opinion about a possible medical malpractice action. When plaintiff asked defendant to suggest a doctor, he indiscriminately selected from the New Jersey Medical Society Directory the names of three, in his words, "orthopedic specialists" who practiced near her. She chose one of them, Dr. Michael Silverstein. Defendant's handwritten office note to the file, dated May 7, 1985, recounts the following telephone conversation with plaintiff regarding her appointment with Dr. Silverstein:
Dr. M. Silverstein  ortho 
New Brunswick NJ
Appt for 5/9/85 11:30 AM
but need X-rays fr Dr. Shafi 
plf called Dr. Shafi for X-rays & was told  no except if plf pd $50 for a copy of X-rays
She'll see Dr. Silverstein w/o the X-rays 
[Emphasis in original.]
Defendant made a memo to the file of a later telephone conversation that he had with Dr. Silverstein. The entry notes that although Dr. Silverstein believed that there was a "poor result," in his opinion Dr. Shafi's treatment did not constitute malpractice. During that conversation the doctor told defendant that he knew Dr. Shafi personally. Dr. Silverstein did not testify.
In the following testimony defendant summed up his entire investigation from December 1983 when he was formally retained until May 1985 when he spoke to Dr. Silverstein:
Q. What facts did you get aside from the emergency room record, what facts did you get?
A. I got the opinion of Dr. Och, and then later the opinion of Dr. Silverstein. Those are facts to me.
Defendant qualified himself at trial as an expert "in the practice of law as it relates to personal injury matters" with particular "experience and knowledge in the area of medical malpractice." Testifying as an expert, defendant gave the following testimony on direct examination as to why he properly refrained from commencing an action against Dr. Shafi?
Q. And did you file a medical malpractice case against Dr. Shafi?
A. Absolutely not.

*424 Q. Why not?
A. Because I didn't think it was ethical for me with the information I had from at least two doctors indicating that Dr. Shafi did nothing wrong that I should sue the man. Why should I in any way create a stigma for him?
Q. You said that you didn't think it was ethical.
A. That's right. There's a provision in the Professional Code of Ethics for Attorneys that an attorney has a duty not to file a frivolous suit or a suit without any basis. I don't know the specific citation but I know there is something in there to that effect and I've been practicing too long to tar myself.
Q. Based on your 30 years of experience, your handling the Grosbard malpractice case [Buckelew v. Grosbard, 87 N.J. 512, 435 A.2d 1150 (1981)],[5] the fact that Mrs. Brizak did not articulate any reason why she thought there was malpractice, and your having spoken to Dr. Och and Silverstein, do you feel it was a departure on your part not to have filed a suit on behalf of Mrs. Brizak?
A. There was absolutely no departure. I think what I did was the proper thing to do. If another attorney had come to me and asked me the same question, what should I do, I have no  I would have advised him the same way.
In a memo to the file dated June 28, 1985, defendant noted that he had told plaintiff over the telephone that she had "no case." That conversation was his last communication with plaintiff regarding his services. He described the telephone conversation in his direct examination as follows:
Q. Did you then call back Mrs. Brizak and explain to her what the result was of your conversation with Dr. Silverstein?
A. I did. I called Mrs. Brizak, maybe, the same day or the day I had this discussion and I told Mrs. Brizak exactly the tenor of that conversation, that here another doctor, Dr. Silverstein has indicated the same thing, you have no basis of a claim. Again I explained to her that she or I are not doctors and we can't guess, we have to have a doctor's opinion as to what was wrong. Unless she could come up with a doctor, there was nothing further I could do.
Plaintiff testified that defendant "never" told her that she did not have a case.
She also testified that defendant "never" told her that "perhaps [she] should consult another lawyer." Defendant acknowledged that he did not advise plaintiff that she might obtain another legal opinion about her case, "... I told her to *425 get another doctor, that's really what the problem was." He further testified that he did not warn her of a limitations problem because in his view her claim would not accrue until she secured the opinion of a medical doctor that Dr. Shafi's treatment was malpractice.
When on cross-examination defendant was asked his opinion as an expert as to whether it is "standard legal practice when withdrawing from a case to send [the client] a close-out letter," he responded:
That's a difficult question to answer in terms of standard legal practice. Sure, I could be a Monday-morning quarterback when I said, you know, boy, we wouldn't be here today if I had sent the letter back in June right after the conversation. The fact is I didn't send the letter. Whether it's standard, it's difficult to say, difficult to say.
Plaintiff's attorney then read aloud RPC 1.16(d), which provides:
Upon termination of representation, a lawyer shall take steps to the extent reasonably practicable to protect a client's interests, such as giving reasonable notice to the client, allowing time for employment of other counsel, surrendering papers and property to which the client is entitled and refunding any advance payment of fee that has not been earned. The lawyer may retain papers relating to the client to the extent permitted by other law.
The record does not disclose when plaintiff consulted her present attorney, Joe Maran, Esq. He filed the present action against defendant on August 11, 1986, more than a year after plaintiff last heard from defendant about her case. Mr. Maran did not obtain Dr. Tuby's written report until June 17, 1987. Defendant contends that under the "discovery rule," the limitations period did not begin to run against the medical malpractice claim until Dr. Tuby rendered his opinion in June 1987, thereby providing for the first time medical proof of Dr. Shafi's malpractice.
The threshold issue is whether, applying the "discovery rule," the two-year limitations period for personal injury actions (N.J.S.A. 2A:14-2) began to run June 17, 1987, as defendant contends. If defendant is correct, plaintiff had until June 17, 1989, to bring an action against Dr. Shafi, and therefore should *426 have sued him for medical malpractice instead of suing defendant for legal malpractice.
In their latest expression of opinions on the point, six Justices were unanimous in rejecting defendant's view. Graves v. Church & Dwight Co., Inc., 115 N.J. 256, 558 A.2d 463 (1989) (affirming by an equally divided court Graves v. Church & Dwight Co., Inc., 225 N.J. Super. 49, 541 A.2d 725 (App.Div. 1988)). The three Justices who concurred with this court's opinion that the "discovery rule" applied quoted from Tevis v. Tevis, 79 N.J. 422, 432, 400 A.2d 1189 (1979) in stating the rule:
The "discovery rule" is a rule of equity that allows the tolling of the statute of limitations "when a party is either unaware that he has sustained an injury or, although aware that an injury has occurred, he does not know that it is, or may be, attributable to the fault of another." [Graves, 115 N.J. at 262, 558 A.2d 463 (O'Hern, J., concurring) (emphasis added).]
The issue in Graves was whether it was equitable to charge the plaintiff with knowledge that baking soda, ingested after a heavy meal to relieve stomach acidity, caused his stomach to rupture. The concurring Justices concluded that such knowledge was not chargeable to plaintiff because it was contrary to the view of all the many qualified physicians who had considered the matter during his extended course of treatment, was contrary to approvals that the product had received over the years from the Food and Drug Administration, and was contrary to common knowledge that the product had been widely used with safety for over a century.
The dissenting Justices, in an opinion written by Justice Clifford, concluded that the plaintiff in fact knew at the time he sustained the injury that it was caused by the baking soda because he reported to the treating doctors that he had suffered severe abdominal pain immediately after having ingested the substance. Employing hyperbole sometimes found in dissenting opinions, Justice Clifford characterized the concurring opinion as departing from well-settled principles:

Henceforth the cause of action in a personal injury case would be deemed to arise not when plaintiff is aware of the facts that may equate in law with a cause of action, but rather when plaintiff and his or her physicians are prepared *427 to prove the medical connection. [Id. at 275, 558 A.2d 463 (Clifford, J., dissenting) (first emphasis added).]
Rejecting this characterization of their opinion by the dissent, the concurring Justices expressly stated that "the Appellate Division has changed no law in its disposition of this case, nor, despite the disagreement of our dissenting members, have we." Id. at 270, 558 A.2d 463 (O'Hern, J., concurring). It is clear to us that all six Justices implicitly rejected defendant's view that in a medical malpractice action the limitations period does not run until a physician is found who is prepared to prove that the doctor's treatment was malpractice.
The trial judge found from the evidence that plaintiff's suspicions ripened into knowledge that her unhealed fracture "may be" attributable to Dr. Shafi's faulty treatment when she engaged defendant to represent her in the matter on December 5, 1983. He inferred that by engaging defendant, plaintiff demonstrated that her suspicions were no longer allayed by assurances Dr. Shafi had allegedly given that her poor recovery was normal. Those suspicions became heightened by the fact that plaintiff was enjoying a better recovery from the severe fracture of her hip than from the earlier fracture of her arm.
Here, unlike the more arcane situations in cases relied upon by defendant, if the bad recovery was anyone's fault, plaintiff had to know that the fault was Dr. Shafi's. Furthermore, the nature of his fault, while not self-evident, was not difficult to determine. Compare Vispisiano v. Ashland Chemical Co., 107 N.J. 416, 428, 527 A.2d 66 (1987), where the Court said, "Among the factors to which courts look in deciding whether a plaintiff is equitably entitled to the benefit of the `discovery rule' are the nature of the injury and the difficulty inherent in discovering certain types of injuries." To be sure, plaintiff did not know for certain that there was malpractice when she engaged defendant, but applying the Tevis formulation of the rule the trial judge properly determined that by then she knew that Dr. Shafi's treatment of her arm may have been faulty. *428 She engaged defendant, an attorney experienced in personal injury cases, to get to the bottom of the matter.
Having determined that it was too late to sue Dr. Shafi when plaintiff commenced the present action, we turn to whether the evidence supports the jury's findings that defendant was negligent and that his negligence was a proximate cause of plaintiff's failure to sue Dr. Shafi by December 5, 1985, two years after she had engaged him to represent her in this matter.
As to the negligence issue, we will first consider whether defendant failed to advise plaintiff of the peril of the statute of limitations in reasonable reliance on his erroneous view that the limitations period did not begin to run until a physician provided evidence of Dr. Shafi's medical malpractice. We will next consider whether defendant failed to conduct a reasonably diligent investigation that would have disclosed a basis for commencing an action against the doctor that would have been timely. As to both of these aspects of defendant's negligence, we will also consider whether the jury could properly have found defendant liable despite the fact that plaintiff did not present expert testimony as to the "degree of reasonable knowledge and skill that lawyers of ordinary ability and skill possess and exercise," the standard of care to which an attorney is held. St. Pius X House of Retreats v. Camden Dioc., 88 N.J. 571, 588, 443 A.2d 1052 (1982).
Although we sustain the trial judge's finding that plaintiff's claim against the doctor accrued on December 5, 1983, it does not necessarily follow that defendant was unreasonable in believing that the claim would not accrue until a physician furnished proof of medical malpractice. We conclude, however, that from the state of the law when defendant made his judgment, there was no reasonable basis for his belief, and that even if there were such a basis, he was obliged to warn plaintiff that her claim could be time-barred sooner in the event his belief was wrong.
*429 Defendant cites no case on which he relied or could have relied at the time he represented plaintiff that defers accrual of a claim subject to the "discovery rule" until a claimant has concrete proof of liability. As previously discussed, the Justices in Graves commented that such a view has never been the law. In the seminal case of Lopez v. Swyer, 62 N.J. 267, 272, 300 A.2d 563 (1973), the Court described the effect of the rule:
... a cause of action will be held not to accrue until the injured party discovers, or by an exercise of reasonable diligence and intelligence should have discovered that he may have a basis for an actionable claim. [Emphasis added.]
There is no reasonable basis for defendant to have held the view that Dr. Shafi would be vulnerable to suit indefinitely on the chance that the basis for a claim might some day come plaintiff's way.
Expert evidence is not required in a legal malpractice case to establish an attorney's duty of care where the duty is so basic that it may be determined by the court as a matter of law. Barth v. Reagan, 190 Ill. App.3d 516, 137 Ill.Dec. 463, 467, 546 N.E.2d 87, 91 (Ill. App. 2 Dist. 1989), app. allowed by 129 Ill.2d 562, 140 Ill.Dec. 668, 550 N.E.2d 553 (1990); Annotation, "Admissibility and Necessity of Expert Evidence as to Standards of Practice and Negligence in Malpractice Action Against Attorney," 14 A.L.R.4th 170 (1982); 2 R. Mallen & J. Smith, Legal Malpractice § 27.15 (3d ed. 1989). Thus plaintiff did not need an expert to refute defendant's obviously incorrect belief that the limitations period did not begin to run until an expert medical opinion was obtained.
It may not be obvious that plaintiff's claim accrued on the day that she retained defendant to represent her in this matter. Arguably defendant reasonably could have believed that plaintiff's claim did not accrue until some later date when "by an exercise of reasonable diligence and intelligence [he] should have discovered that [plaintiff] may have a basis for an actionable claim." Lopez v. Swyer, 62 N.J. at 272, 300 A.2d 563.
Although the judge told the jury that plaintiff's claim against the doctor accrued December 5, 1983, he immediately neutralized *430 any harmful effect that statement might have produced by stating, "On the other hand, it is unethical for an attorney to file a lawsuit unless the attorney reasonably believes there is a basis for doing so, that it is not frivolous." That instruction properly directed the jury to consider whether defendant undertook a reasonably diligent investigation to determine if there was a reasonable basis for commencing an action against Dr. Shafi.
By its finding of negligence, the jury implicitly found that had defendant undertaken a reasonably diligent investigation during the eighteen months in which he represented plaintiff, he would have developed within that time enough evidence to have commenced a timely medical malpractice action against the doctor. See RPC 1.3. ("A lawyer shall act with reasonable diligence and promptness in representing a client.")
Defendant's response is that in the absence of expert testimony, the jury should not have been permitted to speculate that an attorney who has been retained in a personal injury matter has a duty to conduct an investigation of his client's claim. We disagree. In Passanante v. Yormark, 138 N.J. Super. 233, 239, 350 A.2d 497 (App.Div. 1975), certif. den. 70 N.J. 144, 358 A.2d 191 (1976), we defined a litigation attorney's legal obligation to his client:
That obligation encompassed the taking of any steps reasonably necessary in the proper handling of the case. It included, of course, the duty of investigating the facts, formulating a litigation strategy and filing within a reasonable time any action necessary to effectuate recovery.
Accord Giaramita v. Flow Master Machine Corp., 234 N.Y.S.2d 817 (Sup.Ct. 1962) (attorney under duty to investigate every material phase of his client's case); Muse v. St. Paul Fire and Marine Insurance Company, 328 So.2d 698 (La. Ct. App. 1976) (attorney owes client duty of diligent investigation).
We add that an attorney is uniquely equipped to conduct the kind of investigation called for in this matter. If Dr. Shafi refused to disclose his office notes of plaintiff's visits or provide defendant with copies of her medical records, defendant *431 could have obtained discovery either through the commencement of an action or by taking testimony before commencing an action. R. 4:11-3. See Davila v. Continental Can Co., 205 N.J. Super. 205, 500 A.2d 721 (App.Div. 1985).
Although defendant testified that at the beginning of their relationship he told plaintiff that she had the responsibility of finding a medical expert to support her claim, there is credible evidence to the contrary. The retainer agreement at least impliedly contains an undertaking by defendant to conduct a factual and medical investigation to determine if Dr. Shafi had committed malpractice. It provides that the contingent fee "shall be computed on the net recovery arrived at by deducting from the gross recovery all disbursements in connection with the institution and prosecution of the claim, including investigation expenses, expenses for expert or other testimony or evidence, ..." (Emphasis added.) Consistent with this undertaking, defendant secured from plaintiff a signed authorization for him to review and copy her medical records. The jury also could have found that it was not reasonable for defendant to have expected plaintiff to conduct her own investigation in view of her limited education and obvious lack of experience and sophistication in such matters.
The judge held that the jury could have evaluated the reasonableness of defendant's investigative efforts without expert testimony because the evidence on the point was within the grasp of common understanding. Again we agree.
Even in malpractice cases, the facts of a given case may be such that the common knowledge possessed by laymen may permit a finding that a duty of care has been breached. Klimko v. Rose, 84 N.J. 496, 503-504 [422 A.2d 418] (1980). The test of need of expert testimony is whether the matter to be dealt with is so esoteric that jurors of common judgment and experience cannot form a valid judgment as to whether the conduct of the party was reasonable. [Butler v. Acme Markets, Inc., 89 N.J. 270, 283, 445 A.2d 1141 (1982).]
Expert testimony is not required in legal malpractice cases where the issues are not "beyond the knowledge of the average person," Rizzo v. Haines, 520 Pa. 484, 555 A.2d 58, 66 (Pa. 1989), or are "within the ordinary knowledge and experience of *432 laymen." Barth v. Reagan, 190 Ill. App.3d at 521, 137 Ill.Dec. at 467, 546 N.E.2d at 91.
We have previously detailed the ample evidence, fully comprehensible to laymen, from which the jury could reasonably have found defendant negligent for failing to conduct a more diligent investigation. He made no effort to obtain the opinion of someone with appropriate expertise who would be willing to testify. Indeed, he spurned all sources of such experts, relying instead on the informal advice of a friend who was a radiologist but not familiar with surgical procedures, and of an orthopedist chosen at random. Furthermore, he failed to obtain plaintiff's X-rays and Dr. Shafi's office records. The jury could reasonably have found without the guidance of a legal expert that a medical expert would need to examine those materials to make a proper evaluation of Dr. Shafi's treatment.
We do not want to leave the wrong impression. Although expert opinion is not necessary to establish the negligence of a personal injury attorney who fails to conduct any investigation of his client's claim, where the attorney has undertaken some investigation, a jury will rarely be able to evaluate its adequacy without the aid of expert legal opinion. We are convinced that this is one of those rare cases. We nevertheless caution that a plaintiff's attorney who litigates a legal malpractice claim without the opinion testimony of a legal expert unnecessarily exposes his client to a serious risk of dismissal.
The last issue we need to discuss is whether the evidence supports the jury's finding that defendant's negligence was "a proximate cause of plaintiff's failure to timely sue Dr. Shafi for damages." Defendant contends that he withdrew from representing plaintiff in June 1985 when in a telephone conversation he told her that she had no case and should contact him if she finds a physician who would support her claim. Although the limitations period did not expire until the following December 5, the jury reasonably could have found that even if defendant had told plaintiff in June that she had no case, a fact she *433 denied, his lackadaisical investigation, failure to warn of the limitations problem and failure to suggest that she seek the opinion of another attorney were proximate causes of her later inability to sue.
We addressed this issue in Passanante v. York, 138 N.J. Super. at 239, 350 A.2d 497, where, after holding that an attorney has the duty to investigate the facts concerning his client's claim, we further held:
But it did not stop there. Reasonable care in the performance of his duties towards his clients dictated that he take ordinary precautions to protect his clients' interest and not delay filing suit until the eleventh hour. He had the implicit obligation to inform his clients of his failure to act (for whatever cause) at a time sufficiently prior to the running of the statute of limitations to permit plaintiffs to engage another attorney who could then take proper action on their behalf.
This duty to a client upon withdrawal of representation now appears in RPC 1.16(d), which, as we previously noted, plaintiff's attorney read to the jury during his cross-examination of defendant. Defendant's clearly erroneous advice to plaintiff that she need not be concerned about time limitations until she found a physician to support her claim was itself a sufficient basis for linking his negligence to her failure to commence a timely action against the doctor.
We are satisfied from a careful review of this record that the other issues raised are clearly without merit and require no further discussion. R. 2:11-3(e)(1)(E).
Affirmed.
NOTES
[1] The complaint includes a claim by plaintiff George Brizak, Norma's husband, for loss of consortium. It appears from the record, however, that George Brizak died before the complaint was filed. His claim was not advanced at trial.
[2] The doctor read the entry to the jury. Although the record was marked for identification, the document itself was not offered into evidence.
[3] The fracture was to the left humerus.
[4] It was explained in testimony that the reference to a "rotatory component" means that the neck of the humerus completely fractured and the shaft of the bone had rotated out of alignment with its head.
[5] In earlier testimony, defendant explained to the jury that he had made it easier for plaintiffs to recover in medical malpractice cases as the result of his representation of the plaintiff in that case.