267 N.J. Super. 445 (1993)
631 A.2d 1248
WILLIAM GRAVES AND JOYCE A. GRAVES, HIS WIFE, PLAINTIFFS-APPELLANTS,
v.
CHURCH & DWIGHT COMPANY, INC., A NEW JERSEY CORPORATION, DEFENDANT-RESPONDENT.
Superior Court of New Jersey, Appellate Division.
Argued April 26, 1993.
Decided August 11, 1993.
*449 Before Judges PETRELLA, D'ANNUNZIO and KEEFE.
Adrian I. Karp argued the cause for appellants (Mr. Karp and Kenneth M. Trombly, attorneys).
John I. Lisowski argued the cause for respondent (Morgan, Melhuish, Monaghan, Arvidson, Abrutyn & Lisowski, attorneys; Clifford James, Shea & Gould, of counsel).
The opinion of the court was delivered by KEEFE, J.A.D.
*450 Plaintiff William Graves suffered a spontaneous stomach rupture in the early morning hours of August 22, 1979, after ingesting Arm & Hammer baking soda manufactured by Church & Dwight Company, Inc. (Church & Dwight) which he had taken to resolve indigestion. Misdiagnosed as having suffered a perforated ulcer, Graves only came to believe in 1983 that the baking soda caused his injury. On August 8, 1984, he and his wife filed a complaint against Church & Dwight.[1] The eight-count complaint alleged misrepresentation and mislabeling; negligent failure to warn; strict liability in tort; breach of warranty; and fraud.[2]
The matter was tried over several weeks. Only the strict liability warning issue was submitted to the jury, the other claims having been dismissed. The jury was given four interrogatories to answer pertaining to liability. The questions were:
1. Did the plaintiff consume defendant's Arm & Hammer Baking Soda on the night in question?
2. Was the Arm & Hammer Baking Soda product defective by reason of its failure to warn about possible stomach rupture?
3. Was the failure to warn a proximate cause of plaintiff's consumption of Arm & Hammer Baking Soda on the night in question?
4. Was the consumption of Arm & Hammer Baking Soda a substantial contributing factor proximately causing plaintiff's stomach rupture?
The jury unanimously found, in response to the first question, that defendant's product was involved in the incident. By a five-to-one majority it answered questions two in the affirmative and *451 three in the negative. Having found that the failure to warn was not a proximate cause of Graves' injury, the jury did not answer question four.[3]
The trial judge entered judgment in favor of defendant and denied plaintiffs' post-trial motion. Plaintiffs filed a notice of appeal, and defendant was permitted to file a nunc pro tunc cross-appeal from the denial of its summary judgment motion. However, defendant has not briefed the issue raised in its cross-appeal. Thus, the issue is deemed waived, and the cross-appeal is dismissed. Matter of Bloomingdale Conval. Ctr., 233 N.J. Super. 46, 48 n. 1, 558 A.2d 19 (App.Div. 1989).
The trial record discloses the following pertinent facts. As a child, William Graves had been given Arm & Hammer baking soda as an antacid by his grandmother. She would take a teaspoon and measure out "a certain amount" and put it in a glass of water. Plaintiff, however, had not used this home remedy from the time he stopped living with his grandmother in 1939 until August 22, 1979, the date of his injury.
On August 21, 1979, Graves, then 52 years old, was senior assistant editor for National Geographic magazine. He and his wife Joyce, his bride of six months, were in Graves' house in Martha's Vineyard. His then 17 year-old son was also there. Graves ate dinner around 6:30 p.m.. He characterized the meal,[4] which was finished by 7:45 p.m., as "substantial but not huge."
He felt fine when he retired to the bedroom shortly after dinner. He took an iced brandy with him, and read for no more than an hour, before going to sleep between 9:00 and 9:30 p.m.
*452 He awakened around or shortly after midnight with noticeable, although not severe, heartburn. Although he had been diagnosed with an ulcer at twenty-two, he had no real indigestion problems. He infrequently took Bisodol for bouts of indigestion; however, on this occasion, he had no Bisodol and thought of his grandmother's remedy.
He went to the kitchen and took a box of baking soda out, "sifted some of the baking soda into the bottom of the glass," and filled the approximately eight-ounce glass with water to within an inch of its top.[5] This was the same technique he used when he took Bisodol. The baking soda was sufficient in amount to cover the bottom of the glass.
At trial, Graves demonstrated the amount of baking soda he used on August 22 and the manner in which he mixed it with water. The amount was later stipulated to be 5.7 grams. The half-teaspoon dosage recommended by defendant measures 1.8 grams.
Graves drank the solution down quickly. In four gulps he emptied two-thirds of the glass. Before he could return the glass to the counter, an enormous pain drove him to his hands and knees. His wife heard his screams and called for help. Graves told his wife that if he passed out, to tell emergency personnel that "all he did was take a little baking soda."
Graves underwent surgery on August 22, 1979 and was misdiagnosed as suffering from a perforated ulcer. He had six subsequent surgeries for abscesses or hernia repair. His medical specials as of the time of trial totalled $55,085.84.
Baking soda has been used as an antacid for more than 100 years. When the Food and Drug Administration ("FDA") was formed in the 1930s, baking soda, like aspirin, was accorded *453 "GRAS" status; i.e., "Generally Recommended as Safe." Such products were exempt from FDA testing.
Over the years, the recommended dosage varied from one-quarter teaspoon to two teaspoons. In 1979, the Arm and Hammer box recommended one-half teaspoon in a glass of water.
In the 1960s and 1970s, the FDA conducted monograph studies on all GRAS products. Baking soda had its turn in 1974, when the FDA told manufacturers how to label their packaging, including a recommended dosage.
The FDA employed five physicians to help with its baking soda monograph. Two of these, Dr. John Morrissey and Dr. Edward Moore, testified for the plaintiffs at trial. Both said that they relied on the manufacturer to tell them of the potential for, or known, adverse reactions; neither relied on the articles suggesting a causal relationship between baking soda and spontaneous stomach rupture that were included in a bibliography provided to them by FDA researchers.
According to Morrissey and Moore, they would have been concerned with the possibility of stomach rupture from baking soda if they had known about these articles when they were consulting for the FDA. As it was, the FDA was concerned with the effect of long-term use on certain chronic conditions.
Much of the testimony at trial focused on these articles and Church & Dwight's lack of knowledge of their existence. There is no doubt that some of them predate Graves' accident by more than fifty years. The defendant, however, disclaimed any pre-1979 knowledge of them.
The basic premise of both sides was that Graves' stomach was overly distended by his meal, and that for some reason it was not emptying normally. Plaintiffs' theory essentially was that the baking soda combined with stomach acid to create a large volume of gas immediately that, in turn, caused the stomach rupture. Defendant essentially sought to prove that Graves' stomach, whether emptying properly or not, was full enough that the *454 volume of water in which Graves dissolved the baking soda was alone sufficient to cause the rupture, that the very small amount of gas produced was alone sufficient, or that the two factors acted together in concert.
Plaintiffs' gastroenterologists Lawrence Feinman, Morrissey, and Moore found baking soda, as an antacid, could be unsafe in any dosage. However, defense expert, Dr. John Fordtran, opined that it was possible for the amount of baking soda taken by plaintiff to cause spontaneous stomach rupture under certain circumstances, which he hastened to add were not present in Graves' case, and defense expert, Francis Morel, an M.I.T. "aqueous chemist," felt the volume of the bicarbonate solution, but not the bicarbonate, caused the rupture of the overfilled stomach.
In 1979, the Arm and Hammer label read in pertinent part:
AS AN ANTACID
Effective as an antacid to alleviate heartburn, sour stomach and/or acid indigestion.

DIRECTIONS: 1/2 tsp. in glass of water every 2 hours up to maximum dosage or as directed by physician.
........

WARNINGS: Do not take more than eight 1/2 tsp. for persons up to 60 years old or four 1/2 tsp. for persons 60 years or older in a 24 hour period, or use the maximum dosage of this product for more than 2 weeks, except under the advice and supervision of a physician. Do not use this product except under the advice and supervision of a physician. Do not use this product except under the advice and supervision of a physician if you are on a sodium restricted diet.
Graves vacillated between saying that he had never read the label on the Arm and Hammer box, and saying that he must have read the label as a child in his grandmother's house. In any event, he did not read the label in the early hours of August 22, 1979.
Plaintiffs' experts denounced the label, but were far from unanimous as to what warnings should have been given. Dr. Morton Leeds, a pharmacologist, opined that the label, "at a minimum," should indicate that the recommended dose "should not be exceeded." Dr. Feinman testified that the label contained no warning against taking too much baking soda when the stomach was overly *455 distended. Dr. Morrissey said the label did not adequately warn of significant medical risks, although he characterized Graves' injury as a "rare phenomenon."
Dr. Moore suggested that only if "you replace the biceps [in the company's logo] with a skull and cross bones" was it possible that "maybe somebody would notice" the warning. Dr. Brian Strom, a clinical epidemiologist, opined that the 1979 label gave no notice of possible gastric rupture, and did not reveal the actual dangerousness of the product.
Finally, plaintiffs offered a human factors expert, Dr. Robert Cunitz, to testify about the psychology of warnings. He similarly opined that there should have been a warning as to the possibility of stomach rupture, and that the 1979 label was ineffective. He came as close as any of plaintiffs' experts to talking about what kind of warning was necessary.
Cunitz suggested that the warning be moved to the front of the package:
You can use the English language. You could use a pictograph of some picture of a stomach rupturing or something along those lines following somebody ingesting this product from a glass. I mean that would be pretty graphic[.] ... [A] circle and a slash through it would do or an x across it would do to let people know not to do that. Alternatively, you might have to spell out the hazard in words but you also need to include an instruction to avoid harm and you might show a cup or a glass with the product in it and a circle with a circle and a slash through it to indicate that one shouldn't take it this way and then back up with the written language.
After acknowledging that there were probably "twenty ways" to warn, Cunitz went on to suggest that in order to be effective to change a long established pattern of use, the Arm and Hammer name should be relegated to the top one-eighth or one-quarter of the front of the box the logo moved elsewhere, and that a warning take up the rest of the front panel.
Defendant's expert on warnings, psychologist Dr. Donald Horst, offered an opinion that, given the long-accepted practice of using baking soda as an antacid and the general perception of it as safe, warning against a potential danger would be difficult. He did not hold out "much hope" of affecting what people will do with a *456 product if they are generally familiar with its propensities. He believed that using an extreme pictograph simply destroys credibility of the product, and in any event, a skull and cross bones is an inaccurate warning for baking soda. Horst suggested that no warning was needed.
On appeal plaintiffs' present the following issues for resolution:
POINT I IT WAS PLAIN ERROR FOR THE COURT TO HAVE SUBMITTED JURY QUESTION 3, WHICH STATED, "WAS THE FAILURE TO WARN A PROXIMATE CAUSE OF PLAINTIFF'S CONSUMPTION OF ARM & HAMMER BAKING SODA ON THE NIGHT IN QUESTION?"
A. THE TRIAL COURT ERRED IN APPLYING A "BUT FOR" RATHER THAN A "SUBSTANTIAL FACTOR" TEST IN THE VERBIAGE OF QUESTION 3 AND IN INSTRUCTING THE JURY ON PROXIMATE CAUSE.
B. BECAUSE DEFENDANTS PRODUCT BORE NO WARNING ON THE KNOWN RISK OF STOMACH RUPTURE, THE TRIAL COURT ERRED IN NOT INSTRUCTING THE JURY THAT PLAINTIFF WAS ENTITLED TO A REBUTTABLE PRESUMPTION THAT HE WOULD HAVE READ AND HEEDED A PROPER LABEL.
C. THE TRIAL COURT ERRED IN NOT INSTRUCTING THE JURY THAT HAD DEFENDANT'S PRODUCT BORNE A WARNING, THIS DANGER COULD HAVE BEEN READ BY PLAINTIFF ON PRIOR OCCASIONS OR BEEN COMMUNICATED TO HIM BY THIRD PARTIES, SUCH AS HIS WIFE.
POINT II: THE TRIAL JUDGE COMMITTED REVERSIBLE ERROR IN INSTRUCTING THE JURY TO INTERCHANGEABLY APPLY BOTH SUBJECTIVE AND OBJECTIVE STANDARDS IN DETERMINING WHETHER THE LACK OF WARNING WAS THE PROXIMATE CAUSE OF PLAINTIFF'S INGESTING DEFENDANT'S PRODUCT ON THE NIGHT IN QUESTION AND IN HIS COMMENTS ON THE EVIDENCE.
POINT III:
A. THE DISMISSAL OF PLAINTIFF'S CLAIM OF STRICT LIABILITY PREDICATED UPON DEFENDANT'S PRODUCT BEING UNREASONABLY DANGEROUS CONSTITUTED PLAIN ERROR.
B. THE COURT ERRED IN DISMISSING PLAINTIFF'S CAUSE OF ACTION ALLEGING A MISREPRESENTATION AND A MISLABELING OF DEFENDANT'S PRODUCT.
POINT IV: WHERE DEFENDANT CONTENDED THAT NO WARNING WOULD HAVE PREVENTED PLAINTIFF'S INGESTION OF ITS PRODUCT, THE TRIAL JUDGE IMPROPERLY DENIED THE ADMISSION INTO EVIDENCE OF BOTH CONTEMPLATED AND ACTUAL POST-ACCIDENT LABEL CHANGES.
POINT V: THE JURY'S VERDICT ON QUESTION 3 WAS AGAINST THE WEIGHT OF THE EVIDENCE.

*457 POINT VI: A PARTIAL NEW TRIAL SHOULD BE GRANTED AS TO THOSE ISSUES WHICH HAVE NOT ALREADY BEEN DETERMINED BY THE JURY'S VERDICTS.
Our review of the record in light of the issues presented satisfies us that there is no error in the Law Division proceedings warranting our intervention. Therefore, we affirm the judgment under review for the reasons stated herein.[6]

I
In response to the second interrogatory submitted to the jury, the jury found that defendant's baking soda product was defective by reason of its failure to warn about possible stomach rupture.
Plaintiffs' first argument on appeal is that "[i]t was error to submit to the jury the issue of proximate cause between the effect of a non-existing warning and plaintiff's ingestion of the product, where he possessed no conscious knowledge of the danger." The quoted statement from plaintiffs' brief implies that proximate cause, as found in the third jury question, is not an issue in a strict liability case where the plaintiff is unaware of the specific danger, and the manufacturer fails to warn of the danger in its product instructions. Another way of stating plaintiffs' argument is that, where a product is found to be defective for a lack of proper warning, there is a conclusive presumption that a consumer would have read and heeded a warning had it been given; thereby relieving Graves of his burden of proving proximate causation between the defect and his consumption of the product. No authority is cited to support plaintiffs' argument. Indeed, the law is clearly to the contrary. There are a number of cases from our Supreme Court, and this court, that require proof of proximate causation in failure to warn cases where the plaintiff was unaware of the danger. See, e.g. Michalko v. Cooke Color & Chem. Corp., 91 N.J. 386, 402, 451 A.2d 179 (1982); Freund v. Cellofilm Properties, Inc., 87 N.J. 229, 241, 432 A.2d 925 (1981); Molino v. *458 B.F. Goodrich Co., 261 N.J. Super., 85, 98-101, 617 A.2d 1235 (App.Div. 1992); Coffman v. Keene Corp., 257 N.J. Super. 279, 285, 608 A.2d 416 (App.Div.), certif. granted, 130 N.J. 596, 617 A.2d 1219 (1992).
Rather, plaintiffs' question, properly phrased, should be whether there was a genuine factual dispute on the issue of proximate causation which required jury resolution. Evidence that the plaintiff had some knowledge of the danger is, for sure, one way in which such a fact issue may be created. See Campos v. Firestone Tire & Rubber Co., 98 N.J. 198, 209, 485 A.2d 305 (1984). That, of course, does not mean to say that the converse is true; i.e., it does not follow that there is no issue of fact simply because plaintiff had no knowledge of the danger. Fact issues pertaining to proximate causation may be created where there is evidence that
the user was blind, illiterate, intoxicated at the time of the use, irresponsible or lax in judgment or by some other circumstance tending to show that the improper use was or would have been made regardless of the warning.
[Coffman v. Keene Corp., supra, 257 N.J. Super. at 286, 608 A.2d 416 (App.Div. 1992), quoting Technical Chem. Co. v. Jacobs, 480 S.W.2d 602, 606 (Tex. 1972).]
For the reasons stated infra at I.A. there were sufficient facts to submit the issue to the jury.

A.
Plaintiffs alternatively challenge the propriety of submitting the third jury question, contending that, in a failure to warn case, a rebuttable presumption that Graves would have read any warning on the box, and heeded it, is created as a matter of law. They argue that the trial judge erred in failing to consider the presumption and direct a verdict in their favor, because there was no evidence in the record to rebut the presumption. On the other hand, plaintiffs argue that, even if there was sufficient rebuttal evidence, the judge should have instructed the jury that plaintiffs were to receive "the benefit of the doubt" that a warning would have been read and heeded; i.e. the judge should have informed the jury that such a presumption exists.
*459 Although plaintiffs contended at trial that they were not obligated to prove proximate causation, the precise argument concerning the existence of a "heeding presumption" was not raised until post-trial motions. However, because the heeding presumption is so intertwined with the concept of proximate causation, we deem it appropriate to decide the issue on the merits, rather than procedurally bar plaintiffs from raising it now.
In Campos v. Firestone Tire & Rubber Co., supra., decided before this case was tried, there was a suggestion that a heeding presumption might find favor with the Supreme Court. However, it was not until Coffman v. Keene Corp., supra, was decided, that an appellate court of this state definitively found that the absence of a warning created a rebuttable presumption that a plaintiff would have read a proper warning had it been given. More specifically, Coffman stands for the proposition that the heeding presumption is sufficient to sustain plaintiff's burden of proof on proximate causation where the "defendant produces no evidence to overcome the presumption." 257 N.J. Super. at 290, 608 A.2d 416.
We have no doubt that the Coffman court did not intend to limit its holding to asbestos cases, as defendant here suggests. The heeding presumption had its genesis in comment j of the Restatement of Torts 2d, 402A, See, Technical Chem. Co. v. W.T. Jacobs, 480 S.W.2d 602, 606 (Tex. 1972). It has been applied to defective warning cases involving various products in the opinions of other states. See, e.g., the list of cases cited in Coffman, supra, 257 N.J. Super. at 287-88, 608 A.2d 416. Subsequent to Coffman, other parts of this court have stated that the heeding presumption has general application. Fabian v. Minster Machine Co., 258 N.J. Super. 261, 278, 609 A.2d 487 (App.Div.), certif. denied, 130 N.J. 598, 617 A.2d 1220 (1992) (involving a press/product liability case); Molino v. B.F. Goodrich Co., 261 N.J. Super. 85, 100-01, 617 A.2d 1235 (App.Div. 1992) (involving tire/product liability case, specifically noting that the "presumption has been applied to products liability cases not involving asbestos.")
*460 Thus, we agree with plaintiffs that a heeding presumption was relevant in the context of plaintiffs' liability theory. The effect of such a presumption is to require defendant to come forward with evidence sufficient to rebut the presumption, or risk a directed finding against it as to the presumed fact. In re Weeks, 29 N.J. Super. 533, 537-38, 103 A.2d 43 (App.Div. 1954).
While we have looked to the law of other states in deciding whether the heeding presumption should be adopted as a part of the substantive law of this State, see Campos and Coffman, supra, once the presumption has been adopted as a part of our substantive law, it is clear that the effect to be given to the presumption is dictated by the evidence law of New Jersey. Evid.R. 14 provides:
[I]f evidence to the contrary of a presumed fact is offered, the existence or non-existence of such fact shall be for the trier of fact, unless the evidence is such that the minds of reasonable men would not differ as to the existence or nonexistence of the presumed fact.
Under the rule, an assumed fact must be taken to exist if evidence contrary to the assumed fact does not create a genuine issue of fact; i.e. if "reasonable men would not differ as to the existence or non-existence of the presumed fact." Id.; Harvey v. Craw, 110 N.J. Super. 68, 74, 264 A.2d 448 (App.Div.), certif. denied, 56 N.J. 479, 267 A.2d 61 (1970). Conversely, it is logical to conclude that rebuttal evidence sufficient to create a genuine issue of fact so that the "minds of reasonable men" could find that the presumed fact had not been established, is the quantum of evidence necessary to overcome the presumption, and is sufficient to make the existence or non-existence of the presumed fact a question for the jury. Biunno, Current N.J.Rules of Evidence, 1967 Commission Note and comment 1 on Evid.R. 14 (1993).
The burden of coming forward with evidence to rebut the presumption is on the defendant, but the burden of proof never shifts from the plaintiff. Ford Motor Co. v. Township of Edison, 127 N.J. 290, 314-15, 604 A.2d 580 (1992). That is to say, once the presumption is rebutted, the risk of non-persuasion remains with the party upon whom the burden of proof was originally placed, in *461 this case, the plaintiff. Rumson Bor. v. Peckham, 7 N.J. Tax 539, 548-49 (Tax 1985).
Furthermore, under New Jersey law, there is a general prohibition against calling presumptions to the attention of a jury. See Jurman v. Samuel Braen, Inc., 47 N.J. 586, 222 A.2d 78 (1966) and Kirschbaum v. Metropolitan Life Ins. Co., 133 N.J.L. 5, 42 A.2d 257 (E & A 1945). For these reasons, plaintiffs' reliance on Nissen Trampoline Co. v. Terre Haute First National Bank, 332 N.E.2d 820 (Ind. 1975), rev'd on other grounds, 265 Ind. 457, 358 N.E.2d 974 (1976) (holding that the burden of proof on the heeding presumption shifts to the manufacturer), and their reliance on Butz v. Werner, 438 N.W.2d 509 (N.D. 1989) (holding that a jury should be instructed on the heeding presumption), is misplaced, since the evidence law of the states where they were decided is contrary to that of New Jersey.[7]
Plaintiffs contend that there was no rebuttal evidence contrary to the presumed fact that Graves would have read a warning had it been given, and, for that reason, proximate cause was not an issue in the case. Defendant, on the other hand, calls our attention to several areas of evidence which it claims rebutted the heeding presumption. Although we do not endorse all of defendant's arguments on this point, there are several areas of evidence which sufficiently support the conclusion that a jury question was presented.
Graves characterized himself as a "compulsive" reader, especially paying attention to product labels because of a potentially fatal allergy to nuts. In that respect Graves testified, on direct examination, what he would have done if he had seen a warning on the baking soda box:
Q. My final question to you, Mr. Graves is this: Assume back in  on August 22, 1979, you picked up or load [sic] from your shelf in your cupboard that box of Arm & Hammer Baking Soda or a similar box.... And you had seen on it a big skull *462 and cross bones or bold letters saying, may cause stomach rupture, being a reader and being a man with an allergy such as you've described to nuts, what do you believe that you would have done?
........
A. I wouldn't have taken it. I would have put up with the heartburn. I'm conditioned all my life to reading warnings and knowing that certain foods are enormously harmful to me and I think I simply wouldn't have taken it if I had seen an adequate warning or something to call my attention to it.
By introducing evidence in his direct case concerning what he would have done had there been a warning on the product, Graves, perhaps, eschewed reliance on the heeding presumption, but, at the very least, put his credibility as a careful reader and heeder of health warnings in issue.
For at least five years prior to his accident, Graves smoked two to three packs of cigarettes a day, and had a cigarette cough which would sometimes begin in the morning when he got up. He also attributed being winded when climbing stairs to his cigarette consumption. He was aware that cigarettes bore a warning label from the Surgeon General of the United States concerning health hazards. Nonetheless, when asked whether he would have smoked cigarettes on the morning of the accident had a skull and cross bones been on the package of cigarettes, Graves admitted that he "hadn't thought of that."
The evidence concerning Graves smoking, notwithstanding warnings on cigarette packages, was admitted without objection. Such evidence, in our view, provided the jury with a basis to make an analogy between Graves smoking in the face of the health warnings on cigarettes, and his projected behavior if a warning had been on the baking soda.
Additionally, Graves gave inconsistent testimony as to when he last read the baking soda label. Indeed, a jury could reasonably conclude that he had never done so. In any event, while the inconsistency is not determinative, standing alone, the history he gave on reading the label is. The latest date on which Graves could have read the label, was 1939, the year he stopped living with his grandmother. He never remembers reading the label for *463 recommended dosage. Indeed, there is one exchange in the record that puts Graves' attitude concerning baking soda in sharp perspective, and could reasonably be relied upon by a jury to conclude that he would not have read a warning had it been provided:
Q. Did you stand there and read the label that night to find out how much the manufacturer of this product Arm & Hammer Baking Soda told you to put in the glass?
A. No. I didn't.
Q. Why not?
A. I've taken it off and on for over half a century and it always worked, and I've simply felt I think that a reasonable amount would  would work again, would do the job.[8]
Graves' attitude toward the product, coupled with his physical distress after awakening from a sound sleep, could also have been viewed by the jury as producing an instinctive reaction, resulting in Graves reaching for the baking soda, and pouring it into the glass, rather than measuring it as his grandmother had done. Evidence that plaintiff gave inconsistent testimony concerning whether the label provided had ever been read, and/or, evidence that plaintiff's conduct was so instinctive that no warning would have helped, creates sufficient facts to rebut the heeding presumption. Technical Chem. Co. v. Jacobs, supra, 480 S.W.2d at 606; Campos v. Firestone Tire & Rubber Co., supra, 98 N.J. at 210, 485 A.2d 305.

B.
Plaintiffs, again focusing on the third jury interrogatory, argue that the trial judge erred in applying a "but for" rather than a "substantial factor" test in his instructions concerning proximate causation relative to that question. Specifically, plaintiffs' contend that the interrogatories should have stated: "Was the failure to warn a substantial factor in plaintiff's consumption of *464 Arm & Hammer Baking Soda?" Plaintiffs' brief fails to point us to any particular place in the record in which that specific objection was made, nor do plaintiffs indicate where in their objections to the court's instructions this alleged shortfall was brought to the trial judge's attention. Thus, we address the issue in terms of plain error. Gaido v. Weiser, 115 N.J. 310, 558 A.2d 845 (1989). In any event, plaintiffs cite no authority for the proposition that the relevancy of the substantial factor test precludes the use of the term "proximate cause" in the formulation of a jury interrogatory. The substantial factor test is but a modified standard of proximate cause which should be used to explain proximate causation in cases where the occurrence of an event is "produced by concurrent causes." Scafidi v. Seiler, 119 N.J. 93, 109, 574 A.2d 398 (1990).
Interestingly, plaintiffs' argument that the substantial factor test should have been utilized is a concession that a fact-finder could conclude under the evidence in this case that causes other than the lack of warning contributed to plaintiff's consumption of the baking soda on the night in question. Although plaintiffs do not specifically say so in their brief, the argument appears to concede that Graves' overly distended stomach, and the resulting discomfort, were at least contributing causes of his accident, and that is why the "substantial factor" test is appropriate. The very concept of proximate cause "includes the notion of concurrent cause when more than one act contributes to the accidental harm." Brown v. United States Stove Co., 98 N.J. 155, 171, 484 A.2d 1234 (1984). Certainly, a jury could have found on this record that Graves's distress resulting from his dysfunctional stomach caused him to ingest the baking soda, and that the absence of an adequate warning of possible stomach rupture was just one, albeit, a substantial factor, in contributing to that conduct. Thus, we agree with plaintiffs that the substantial factor test was the appropriate test of proximate causation in the context of the third jury interrogatory.
On appeal, a jury charge must be reviewed in its entirety. State v. Wilbely, 63 N.J. 420, 422, 307 A.2d 608 (1973). In the *465 final analysis, it is a question of whether or not the jury was confused or mislead by the charge in its entirety. Navarro v. George Koch & Sons, Inc., 211 N.J. Super. 558, 512 A.2d 507 (App.Div.), certif. denied, 107 N.J. 48, 526 A.2d 138 (1986).
Plaintiffs cite one excerpt from the charge that they now contend shows the imposition of a "but for" test:
Now, what do we mean [by proximate cause] in the context of a lack of warning case? ... [I]s it probable that such a warning would have been effective in deterring the plaintiff from the conduct, in this case, the consumption of the product in question which he claims caused his injury.
Plaintiffs do not specifically articulate their quarrel with the portion of the charge they quote. We assume it has to do with the use of the word "probable," which arguably invokes the standard definition of proximate cause as "a cause which naturally and probably led to and might have been expected to produce the injury complained of." Model Jury Charge (Civil), Proximate Cause, § 7.11 (1973). Assuming that to be the case, plaintiffs, nevertheless, offer no support for the argument that the mere use of the word "probable" could have interfered with the jury's function. We are not of the view that the quoted section of the charge reasonably conveyed to the jury an instruction that it could answer the question in the affirmative only if it found that Graves would not have consumed the baking soda "but for" the lack of warning. As noted earlier, we must look to the charge as a whole in determining whether the jury was mislead. Immediately after the now objected to portion of the charge, the trial judge told the jury that: "[b]y proximate cause we do not mean that be the only cause." Later in his instructions on the same issue he said:
Again whenever I say proximate cause understand there may be more than one proximate cause to any particular accident[.] [S]o long [as] its a contributing factor[,] to [that] extent it may indeed be a proximate cause.
Finally, on this point, it is reasonable to infer that plaintiffs' failure to specifically object to the charge on the specific grounds now advanced can be taken to mean that counsel did not consider the claimed error to be significant in the context of the trial. State v. Macon, 57 N.J. 325, 333, 273 A.2d 1 (1971).

*466 C.
Plaintiffs also contend that the trial judge committed reversible error in instructing the jury to interchangeably apply both subjective and objective standards in determining whether the lack of warning was a proximate cause of plaintiff's ingesting defendant's product on the night in question.
There are different standards for different elements in such cases, as the Supreme Court stated in Campos v. Firestone Tire & Rubber Co., supra. There is an objective duty of a manufacturer to produce a defect-free product. Campos, supra, 98 N.J. at 209, 485 A.2d 305; cf. Johansen v. Makita USA, Inc., 128 N.J. 86, 102, 607 A.2d 637 (1992), (duty to manufacture a safe product exists irrespective of plaintiff's conduct). The objective duty of the manufacturer in a warning setting is best exemplified by the Legislature's recent codification of prior law:
An adequate product warning or instruction is one that a reasonably prudent person in the same or similar circumstances would have provided with respect to the danger and that communicates adequate information on the dangers and safe use of the product, taking into account the characteristics of, and the ordinary knowledge common to, the persons by whom the product is intended to be used[.]

[N.J.S.A. 2A:58C-4.]
It is the subjective knowledge of the plaintiff, however, that is relevant in determining whether a breach of the manufacturer's duty is a proximate cause of the injury in question. Campos supra, 98 N.J. at 209, 485 A.2d 305.
In our view, the trial judge maintained that distinction in his instructions. He directed the jury first to apply a reasonable person standard to determine whether defendant's warning was adequate, and then to determine if an adequate warning would have deterred Graves specifically. Both in his original instructions to the jury on interrogatory number three, and in his supplemental instructions on that interrogatory in response to the jury's question, the trial judge necessarily had to discuss the objective standard and the subjective standard together because *467 he had no idea how the jury was going to respond to interrogatory number two, which specifically addressed the objective standard.
Nor do we find error in the trial judge's comment to the jury that the human factors experts could not testify as to what went on in Graves' mind. The judge's statement that the best such testimony could do is inform them what the "public at large," or those in "controlled groups," do, was an accurate comment on the testimony offered. The trial judge did not prohibit the jury from drawing an inference from the general proposition to Graves' subjective thought process. A judge may comment on the evidence when it will assist the jury in its findings. Dafler v. Raymark Industries, Inc., 259 N.J. Super. 17, 37, 611 A.2d 136 (App.Div.), certif. granted, 130 N.J. 601, 617 A.2d 1223 (1992).

D.
At trial, plaintiffs objected to the trial judge's use of the phrase "the night in question" with respect to the third jury interrogatory. They argued then, as they now do on appeal, that the use of that phrase foreclosed the jury from considering the effect, if any, that an adequate warning might have had on Graves' conduct had it been placed on the product years earlier, postulating that the warning could then have been communicated to Graves through third parties.
There was evidence before the jury, fortified by counsels' arguments, that defendant could have and should have warned of the risk of stomach rupture many years before 1979. Dr. Cunitz, plaintiffs' human factors expert, testified that the existence of warnings over a long term have an impact on consumer expectations relative to a product's qualities. He said:
Well, what happens is common sense changes. That's really what it is. Had there been a warning for a good number of years on this product, then people's common knowledge and, therefore, their common sense about the product begins to change and ultimately does change.
*468 Indeed, a jury may have reasonably inferred from this testimony, and other related testimony offered at the trial, that a warning, placed on the baking soda before 1979, may have had some impact on Graves' knowledge concerning the product's efficacy. If the jury instructions were such that the trial judge foreclosed the jury's consideration of that issue, we might agree with plaintiffs' argument that the issue of proximate causation was too narrowly focused. But our review of the instructions do not reveal any such limitation on the jury's understanding of its function in addressing that question.
Moreover, the words themselves do not constitute error standing alone. Clearly, plaintiffs had the burden of proving that the defect in the product's instructions and warnings, whenever that defect is considered to have existed, was a proximate cause of Graves' consumption of the product on August 22, 1979. Certainly there would have been nothing wrong with the question had the trial judge placed the date of consumption in the interrogatory. Substituting the date with the phrase "on the night in question" is a distinction without a difference. The important thing is that the judge's instructions did not limit the jury's consideration of all the evidence relevant to the subjective aspect of Graves' conduct and knowledge in determining the issue of proximate causation.

II
Plaintiffs contend that the trial judge erred in dismissing their "unreasonably dangerous product" claim which they contend was set forth in Count IV of their complaint. We have reviewed that count of the complaint and fail to find any clear reference to such a claim. However, we shall address the issue on its merits.
Plaintiffs argue that they postulated defendant's liability on separate theories of a failure to warn, and on "having placed an unreasonably dangerous product in the market place." Their reliance upon the "unreasonably dangerous" phrase is apparently based on the words of Restatement of Torts, Second, § 402A. However, that rubric has long been in disfavor in this State. *469 Suter v. San Angelo Foundry & Machine Co., 81 N.J. 150, 174, 406 A.2d 140 (1979). "Defining the strict liability principle in terms of a defect and an unreasonably dangerous condition does not advance an understanding of the concept and will not assist a jury's comprehension of the issues which it must resolve." Id. at 176, 406 A.2d 140. Thus, we are somewhat at a loss to understand the import of plaintiffs' argument in the context of New Jersey decisional law.
There are but "three theories under which a manufacturer or seller may be held strictly for harm caused by a product  defective manufacture, defective design, and defective warnings[.]" Dewey v. R.J. Reynolds Tobacco Co., 121 N.J. 69, 94-95, 577 A.2d 1239 (1990). This was so, before and after the New Jersey Product Liability Act, N.J.S.A. 2A:58C-1 et seq. If plaintiffs are arguing a theory, albeit mislabeled, different from their failure to warn theory, we can only assume that what they are really contending is that defendant's baking soda product is one whose risks outweigh its utility, a concept used in a design defect liability case. See O'Brien v. Muskin Corp., 94 N.J. 169, 463 A.2d 298 (1983). However, if plaintiffs are claiming that defendant is liable under a design defect theory, their argument is factually unsupported by the evidence.
Undoubtedly, there was expert evidence offered by plaintiffs from which one could infer that the ingestion of any amount of baking soda carried some risk, and that it simply should not have been marketed as an antacid. However, baking soda has other safe uses. No suggestion was made by any of plaintiffs' witnesses that baking soda was a dangerous product for all purposes. No one suggested taking the product off the market. Quite simply, the resolution of the issue plaintiffs' experts posed in this narrow view of the evidence cannot be resolved in the context of the risk/utility analysis applicable to a pure design defect case, because the crux of the safety problem lies in the warning rather than the physical properties of the product itself. See, Freund, supra, 87 N.J. at 242, 432 A.2d 925. ("[W]here the design defect *470 consists of an inadequate warning as to safe use, the utility of the product, as counterbalanced against the risks of its use, is rarely at issue.") Thus we conclude that the trial judge was correct in determining that the evidence in this case created a product defect issue based on inadequate warnings.

III
Plaintiffs contend that the trial judge erred in dismissing their causes of action based upon Restatement of Torts, Second, § 388 (Chattel Known to be Dangerous for Intended Use), Restatement of Torts, Second § 402B (Misrepresentation by Seller of Chattels to Consumer) and N.J.S.A. 24:5-1, -10, -18a, and -18f (misbranding of a drug product). The trial judge held that these causes of action were essentially based on negligence principles and subsumed by strict liability. In dismissing them, the judge relied upon this court's decision in Tirrell v. Navistar Intern., Inc., 248 N.J. Super. 390, 591 A.2d 643 (App.Div. 1991), certif. denied, 126 N.J. 390, 599 A.2d 166 (1991) which held that, even before the adoption of the Product Liability Act, our common law had progressed to the point where personal injury claims resulting from product injuries were to be pled and proved on strict liability principles, rather than on breach of implied warranty or negligence concepts. Id. at 399, 591 A.2d 643.
Defendant contends on appeal, that the causes of action in question were the subject of amendments to interrogatories, rather than amendments to pleadings, after the New Jersey Product Liability Act became effective, and, therefore, are barred by the Act. Defendant also contends that, with respect to the New Jersey statutory cause of action, no private right of action is created by the statute because of its penal nature, or, alternatively, the statute does not apply to products which cause injuries outside of the State of New Jersey.
We will assume, for the purpose of discussion, that the New Jersey Product Liability Act did not preclude these causes of action, that the causes of action are not based on negligence, that *471 the New Jersey statute concerning misbranding of a drug product creates a personal cause of action, and that the trial judge erred in striking the claims.
However, it is not sufficient simply for plaintiffs to prove that some legal error exists in the trial record. Plaintiffs are obliged to show that the legal error was "of such a nature as to have been clearly capable of producing an unjust result[.]" R. 2:10-2. Plaintiffs utterly fail to address in their brief how a strict liability claim based upon a failure to warn differs from the three dismissed causes of action, and how those differences may have impacted on the jury's determination in this case.
It appears to us that the three theories proposed by plaintiff are simply alternative ways in which a jury might determine that the product was defective, i.e. unsafe, because of inadequate warnings. Because that is precisely what the jury found in response to the second jury interrogatory, we are at a loss to understand how plaintiffs were harmed by the consolidation of those theories into the strict liability/warning theory on which the jury was instructed. Under any theory of liability, even those excluded by the trial judge, the jury was required to determine proximate causation. Plaintiffs fail to explain how a finding in their favor on any of the excluded causes of action might have impacted on the proximate causation issue in a more favorable way. Thus, we find no reversible error in the trial court's exclusion of the subject causes of action.

IV
Plaintiffs contend that the trial judge improperly precluded evidence of both contemplated and actual post-accident label changes. They contend that the actual changes should have been permitted into evidence because they do not qualify as remedial changes, but, rather, reflect on the credibility of defendant in that it took the position that the baking soda could not generate enough gas to cause a rupture but subsequently changed the label to warn against such injury. With respect to the proposed but not *472 adopted changes, plaintiffs argue that the proposed changes show a continuing course of objectionable conduct on defendant's part, and that the proposals were therefore admissible.
The evidence, if admitted, was clearly relevant on the question of product defect, and the fourth jury interrogatory which was not answered. Because the jury resolved the product defect issue in plaintiff's favor, the exclusion of that evidence produced no harm to plaintiff. Thus, even if the trial judge was wrong in excluding the evidence, a question we specifically do not decide, such error would not be reversible. R. 2:10-2.

V
Plaintiffs contend that if the third jury interrogatory was properly submitted for the jury's consideration, its verdict in response to the question is against the weight of the evidence. However, plaintiffs' argument focuses on the question of product defect, a question that was resolved in plaintiffs' favor when the jury answered the second interrogatory. The question addressed in number three was whether, even if the proper warning had been placed on the product, such warning would have been a substantial factor in preventing Graves' consumption of it, and the resulting harm. Plaintiffs fail to analyze the evidence on that issue toward a conclusion that reasonable minds could not differ on the subject as required by R. 2:10-1. As indicated earlier in this opinion, we conclude that a genuine fact issue was presented on the proximate cause issue. The jury's resolution of that issue against plaintiffs has a factual basis in the record.
The judgment under review is affirmed.
NOTES
[1] References herein to "Graves" or "plaintiff" is to William Graves. References to "plaintiffs" is to William and Joyce A. Graves.
[2] Church & Dwight's motion to dismiss the complaint as time-barred or, in the alternative, for a Lopez v. Swyer hearing was denied by order of April 22, 1985. In response to defendant's motion for leave to appeal, a panel of this court summarily reversed the denial of a Lopez hearing.

After the hearing on remand, the complaint was dismissed as time-barred. This court reversed that dismissal. 225 N.J. Super. 49, 541 A.2d 725 (App.Div. 1988). A divided Supreme Court split evenly on its review of the decision, and the Appellate Division ruling stood. 115 N.J. 256, 558 A.2d 463 (1989).
[3] Question four apparently was based on defendant's theory that the mere ingestion of any liquid would have caused Graves to suffer the spontaneous rupture.
[4] For dinner plaintiff had two martinis with some Fritos, followed by chili (probably one eighteen ounce bowl but possibly part of a second), cornbread, salad with dressing, and a glass of wine.
[5] At trial an attempt was made to show that Graves took Davis baking powder, rather than Arm & Hammer baking soda. This dispute accounts for the first special interrogatory on product identification. The issue is not, however, being disputed on appeal.
[6] We do not address the issues necessarily in the same order as they were raised by plaintiff.
[7] We note that Evid.R. 301, now effective in this State, is consistent with our rulings concerning the effect of a rebuttable presumption in New Jersey.
[8] The amount plaintiff actually consumed was approximately three times the recommended dose.